IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| METAVATION, LLC, | ) | Case No. 13-11831 (BLS) |
| | ) | |
| Debtor. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF JOHN C. DIDONATO IN SUPPORT OF METAVATION, LLC PETITION AND FIRST DAY MOTIONS

I, John C. DiDonato, hereby declare that the following is true to the best of my knowledge, information and belief:

1.     I am the Chief Restructuring Officer of Metavation, LLC ("Metavation" or the "Company"). I am also the Chief Restructuring Officer of Revstone Industries, LLC and its affiliated debtors and debtors in possession (collectively, the "Original Debtors" and together with Metavation, the "Debtors") I have been the Chief Restructuring Officer ("CRO") of the Original Debtors since January 17, 2013. I am a Managing Director of Huron Consulting Services LLC ("Huron") and Practice Leader of the Financial Consulting Practice within Huron.

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's federal tax identification numbers are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool & Engineering, LLC (6450). The location of the Debtors' headquarters and the service address for each of the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.

Huron maintains its principal place of business at 550 W. Van Buren Street, Chicago, Illinois 60607. Huron specializes in, among other things, bankruptcy and restructuring consulting, interim management and financial and operational consulting to financially troubled companies.

2.    My current duties for the Debtors include general supervision of, and responsibility for, the Debtors' business and financial affairs and activities and reviewing, formulating and assisting with the Debtors' business plans and strategies. I am authorized to make decisions with respect to all aspects of the management and operation of the Debtors' business including, without limitation, organization, human resources, marketing, sales, logistics, finance, administration, oversight, and of the prosecution of these bankruptcy cases. In my capacities with the Debtors, I have general knowledge of the books and records of the Debtors, and am familiar with the Debtors' financial and operational affairs.

3.    I submit this declaration (the "Declaration") in support of the petition and "first day" motions, described further below (collectively, the "First Day Motions"), filed in the chapter 11 case of Metavation. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of Metavation's books and records, relevant documents and other information prepared or collected by Metavation's employees, or my opinion based on my experience with the Metavation's operations and financial condition. In making my statements based on my review of the Metavation's books and records, relevant documents and other information prepared or collected by Metavation's employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would

competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this Declaration on behalf of Metavation and the Debtors.

4.    Based on my personal knowledge, and through my review of the Debtors' books, records and other information, I believe that the relief sought by Metavation in the First Day Motions is necessary to enable Metavation to continue to operate as a debtor in possession during the course of its bankruptcy case and in particular, up through a sale of substantially all of Metavation's assets, which such sale Metavation seeks to expeditiously effectuate, as discussed more fully herein.

5.    Part I of this Declaration describes the business of the Debtors and the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of these chapter 11 cases (the "Cases").[2]

## PART I

**A.    Overview of Metavation and its Operations**

### Introduction

6.    Metavation, LLC is a Michigan-based manufacturer of precision machined components and assemblies, including dampers, engine components, knuckles, and driveline products for the automotive industry. Metavation specializes in designing and manufacturing

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

dampers that are included on original equipment manufacturers' ("OEMs") engine platforms. The Company also has rapid development capabilities to produce "solution" dampers to correct driveline and powertrain noise vibration and harshness ("NVH") issues. The Company is an entrenched, fully-qualified supplier to North American OEMs. In addition to its leading damper and engine component production capabilities, Metavation also maintains precision machining capabilities for powertrain, chassis, and other components. The Company serves many of the largest automotive customers, suppliers, and platforms. The Company's major OEM customers include General Motors and Chrysler. Metavation's Tier I supplier customers include American Axle, Dana Automotive, and J.G. Kern. These long-standing relationships have led the Company to a dominant market position in the U.S. crankshaft and driveline damper markets.

### Business Operations

7.     Metavation's core competencies include the manufacture of precision machined components and assemblies, however Metavation specializes in designing and manufacturing dampers that are included on OEM engine platforms. The Company also has rapid development capabilities to produce "solution" dampers to correct driveline and powertrain NVH issues.

8.     On average, Metavation produces three to four million dampers annually and is the only North American damper manufacturer to offer in-house custom rubber compounding and manufacturing as well as in-house precision machining capabilities for virtually all damper components. Crankshaft dampers are placed in the front of the engine with the purpose of reducing torsional twisting of the engine's crankshaft. Driveline dampers are

4

"solution" dampers that correct driveline and powertrain NVH issues for customers and sometimes can be found in multiple locations within a vehicle.  There are several different components that make up a damper assembly.  Unique capabilities allows Metavation to be a "one-stop-shop" for precision machining and the rubber blends that make up the damper, strategically allowing it to complete the assembly in a single location at an effectiveness and efficiency that results in a superior end product.

**Production Facilities**

9.    Metavation operates from four modernized facilities located in central Michigan.  The Company begins its manufacturing process by developing the rubber component at the Hillsdale, MI facility, and then sends the rubber component to the Mt. Pleasant, MI or Vassar, MI facility for machining and/or assembly.  Metavation's manufacturing facilities are described below:

- **Rubber Plant and Tech Center** – 16,000 square foot production facility located in Hillsdale, Michigan; employs 20 non-union employees producing strip and rope rubber, molded assemblies and prototypes for distribution to other Metavation production facilities and other auto manufacturers in North America;

- **CNC Machining and Assembly Plant #1** – 80,000 square foot manufacturing facility located in Mt. Pleasant, Michigan; the facility's 177 non-union employees produce crankshafts, drivelines, dampers and steering knuckles distributed to other auto manufacturing facilities in North America and China;

- **CNC Machining and Assembly Plant #2** - 27,000 square foot production facility located in Vassar, Michigan; employs 16 non-union employees producing driveline dampers and crankshaft damper components for distribution to other auto manufacturers in North America; and

- **Vassar Foundry** – gray iron foundry facility located in Vassar, Michigan.

**Design and Engineering**

10.     Metavation's design and engineering capabilities are a core competency and competitive advantage for the Company. Because every product is custom-engineered to meet the customer's specifications, the breadth and depth of Metavation's engineering expertise are a critical component of the Company's success. Metavation's engineering staff is based in Southfield, Michigan.

**Metavation's Customers and Suppliers**

11.     As previously mentioned, Metavation's collaborative approach and product engineering expertise has enabled the Company to become the entrenched supplier of damper and related components for leading automotive OEMs. Metavation has enjoyed strong relationships with General Motors since its founding in the 1940s, and Ford, Chrysler and Caterpillar, since its days as Hillsdale Automotive and EaglePicher, for over 40 years. As a result of these long-standing customer relationships, the Company is repeatedly offered the opportunity to work with customers on their newest flagship platforms, such as: Gen V (General Motors) and Pentastar (Chrysler).

12.     Metavation's collaborative approach has also afforded the Company the opportunity to build strong supply relationships, allowing it to have consistent sourcing which leads to improved product and quality control. Metavation's relationships with its two most strategic and fundamental suppliers were formed over 25 years ago.

**B.**     **The Debtors' History and Corporate Structure**

13.     The Company was founded as Hillsdale Tool and Manufacturing Company in 1940.  Since that time, Metavation has built upon its advanced engineering and manufacturing capabilities to become the North American market's leading, independent supplier of engine and transmission dampers.  Metavation was formally established in 2008 with the acquisition of the Hillsdale Automotive division of Eagle-Picher, and a few years later, Grede Vassar Foundry.

14.     Attached hereto as **Exhibit A** is a detailed chart that sets forth Metavation's corporate relationship to the Original Debtors and other non-Debtor affiliates.  The current officers of Metavation are: (a) John C. DiDonato, Chief Restructuring Officer; (b) David Jaeger, President; (c) Daniel V. Smith, Secretary and General Counsel; (d) James O'Toole, Assistant Secretary and Deputy General Counsel; (e) James M. Lukenda, Deputy CRO; (f) Laura Marcero, Deputy CRO; (g) Brian Linscott, Interim CFO; (h) Geoff Frankel, Vice President; (i) John Owens, Interim Treasurer; and (j) John Hemingway, Interim Assistant Treasurer.

**C.**     **Equity and Significant Indebtedness**

15.     Metavation is a wholly owned subsidiary of Revstone Transportation, LLC which, in turn, is a wholly owned subsidiary of Debtor Revstone Industries, LLC. Metavation is an affiliate of Debtors Greenwood Forgings, LLC, US Tool & Engineering, LLC and Spara, LLC.  Similar to the Original Debtors, Metavation is a subsidiary of Ascalon Enterprises, LLC.

16.    As of the Petition Date, the outstanding indebtedness under the Prepetition

Credit Facility was approximately $17.5 million, consisting of approximately (a) $3.6 million

owed to Wells, as Lender, by the Debtor, Contech and MW Texas Die, (b) $12.4 million of

outstanding unpaid advances made to the Debtor by the Existing Junior Participants, GM, Ford

and Chrysler, and (c) $1.5 million of outstanding unpaid advances made to Contech by the

Existing Junior Participants, Ford, Chrysler, JTEKT and Nexteer.

17.    The Debtor's indebtedness to the Existing Junior Participants under the

Prepetition Credit Facility arose under that certain *Junior Participation Agreement* dated January

11, 2013, as amended by that certain *Amended and Restated Junior Participation Agreement*

dated as of April 12, 2013, pursuant to which Wells as Lender sold to the Existing Junior

Participants a junior participation in certain supplemental advances to the Debtor under the

Prepetition Credit Facility.  The approximately $12.4 million owed by the Debtor for advances

made by the Existing Junior Participants GM, Ford and Chrysler, is secured solely by the

Debtor's assets and not by the assets of any of the Debtor's affiliated co-borrowers or guarantors

under the Prepetition Credit Facility.  Similarly, the approximately $1.5 million owed by the

Debtor's non-debtor affiliate, Contech, for advances made by the Existing Junior Participants is

secured solely by Contech's assets and not by any of the Debtor's assets.  The Debtor's

obligations to the Existing Junior Participants under the Prepetition Credit Facility are, in all

instances, subordinate to the Debtor's obligations to Wells as Lender.

18.    The Debtor also owes approximately $2.3 million for overdue payments to

the Hillsdale Hourly Pension Plan and Hillsdale Salaried Pension Plan, with respect to

approximately $1.6 million of which the PBGC has asserted a lien in the Debtor's assets. The

PBGC has asserted in addition an approximately $56.3 million claim, that is contingent and

unliquidated, on account of the Debtor's alleged pension liabilities.

19.     The Debtor also has approximately $9.1 million of other, unsecured

indebtedness, including approximately $800,000 to GM for advances made to the Debtor on an

unsecured basis.

## PBGC Liens and Subordination Agreement

20.     Prior to the petition date, Metavation and certain of its affiliates failed to

make certain contributions to the Hillsdale Hourly Pension Plan (the "Hillsdale Hourly Plan") on

account of which liens have arisen in favor of the Hillsdale Hourly Plan in the aggregate amount

of the missed contributions to the Hillsdale Hourly Plan. The Pension Benefit Guaranty

Corporation (the "PBGC") has perfected such liens (the "PBGC Liens") prior to the petition

date.

21.     Pursuant to the that certain *Subordination Agreement* dated June 27, 2013

(the "PBGC Subordination Agreement"), PBGC, Wells and the borrowers under the Prepetition

Credit Facility, including Metavation, agreed that the PBGC Liens that may arise prior to July

31, 2013 (regardless of whether such PBGC Liens are recorded) shall be subordinate and junior

in right of payment and priority to the liens of Wells related to the Prepetition Credit Agreement.

The parties further agreed, among other terms and conditions, that (a) the agreement to

subordinate the PBGC Liens shall not extend or apply to any advances made by Wells under the

Prepetition Credit Agreement after July 31, 2013 and (b) that, through July 31, 2013, the

maximum loans outstanding under the Prepetition Credit Agreement will not exceed $21.5

million to the Debtor and its affiliated borrowers. Furthermore, upon the sale of the Debtor or its

affiliated borrowers, the proceeds of such sales shall be applied to, first, satisfy the liens and

claims of Wells and, second, to satisfy the existing unpaid contributions to the Hillsdale Hourly

Plan and the Hillsdale Salaried Pension Plan and to pre-pay the remaining contributions for year

2013. The total payments to the pension plans upon the sale of the assets of the Debtor or its

affiliated borrowers shall not be less than $6.2 million.[3]

**D.**     **Circumstances Leading to the Commencement**
         **of the Chapter 11 Case and Goals of Chapter 11 Case**

22.     As detailed in the *Declaration of Jay N. Brown in Support of First Day*

*Pleadings* [Docket No. 10] (the "Brown Declaration") filed concurrently with the filing of the

chapter 11 case of Revstone Industries, LLC, the Original Debtors had been negatively impacted

by a lack of liquidity in the credit market for middle market borrowers, and had only been able to

obtain one-off financings at relatively high interest rates to fund their operations. The tight credit

markets and restrictive financing covenants led to defaults and disputes with their key lenders,

further exacerbating liquidity issues. As a result, in late 2012 Revstone Industries, LLC and its

affiliated companies embarked on a comprehensive process of sales and financings in order to

enable the companies to restructure in a thoughtful and deliberate manner, for the benefit of all

of its constituents. While Metavation did not experience the impact of the tight credit market to

---

[3] The terms of the PBGC Subordination Agreement with the PBGC as summarized herein are qualified in their
entirety by the language within the PBGC Subordination Agreement.

the same degree of its affiliates, the Company also joined in exploring the options presented by

sales and financings.  Metavation retained Huron in October 2012 to market its assets to strategic

buyers in the automotive supplier industry.

23.     On December 3, 2012, Debtors Revstone Industries, LLC and Spara, LLC

commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy

Code.  On January 7, 2013, Debtors Greenwood Forgings, LLC and US Tool & Engineering,

LLC commenced their cases by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.  After the filing of the Original Debtors, Metavation faced increased pressure

from OEMs and its other customers to effectuate a change of control of the operating businesses

of the Debtors and their affiliates.

24.     In parallel with its efforts to market or restructure their assets, Metavation

established lines of communication with the OEMs and other customers, including negotiation of

OEM funding accommodations and management of customer relationships.  As a result of these

negotiations, major customers agreed to pull forward payment terms from approximately 45 days

to 10 days generating substantial liquidity, and customers agreed to provide up to $4.4 million of

junior participation funding.

## Change of Governance of Metavation

25.     As detailed above, Metavation is a wholly owned subsidiary of Revstone

Transportation, LLC which, in turn, is a wholly owned subsidiary of Debtor Revstone Industries,

LLC.  On January 17, 2013, Debtor Revstone Industries, LLC and non-Debtor Revstone

Transportation, LLC formally effectuated governance changes.  Two independent managers

(Richard E. Newsted and James B. Shein) were appointed to the three member boards of Revstone Industries, LLC and Revstone Transportation, LLC, among other affiliates, and John C. DiDonato of Huron was appointed as Chief Restructuring Officer of the same companies. The independent managers together constitute a majority of the managers on the boards of Revstone Industries, LLC and Revstone Transportation, LLC. The independent managers also were appointed to a restructuring committee of the boards (the "Restructuring Committee"), which was specifically charged with the task of overseeing the CRO and all bankruptcy-related actions of the Original Debtors and their non-Debtor subsidiaries, including Metavation.

26.    Section 4.1 of the Metavation LLC Agreement provides that, subject to certain exceptions not at issue here, "all decisions regarding the management and administration of the Company shall be made by, and the business and affairs of the Company shall be managed under the direction of, the Members." The sole member of Metavation is Revstone Transportation, LLC. Hence, by virtue of the CRO's management of the sole member under the oversight of its Restructuring Committee, Metavation also is managed by the CRO of Revstone Transportation, LLC under the oversight of Revstone Transportation, LLC's Restructuring Commitee. In addition, by amendment of the Metavation LLC Agreement on July 18, 2013, Mr. DiDonato was appointed as the Chief Restructuring Officer of Metavation. Upon the Court's approval of the proposed retention, Mr. DiDonato as CRO will continue to report to, and to act under the direction, control and guidance of, Revstone Transportation, LLC's Restructuring Commitee, subject to removal and/or termination thereby.

**Negotiations/Settlement with OEMs**

27.    Following the bankruptcy filing of Revstone and even prior to that time, Revstone and its affiliates, including Metavation (the "Revstone Group"), faced significant pressure from the OEMs to effectuate a change of control of the operating businesses of Revstone and each of its affiliates.  As a result of the pressure, among other things, the Revstone Group has been in the process of marketing their assets in an effort to preserve going concern value and maximize recovery to all constituents.  These efforts have led to the pending sale of the assets of Contech and Contech Real Estate to Shiloh Die Casting Midwest LLC, and have also resulted in the currently proposed sale of Metavation's assets as described in more detail below.

28.    In addition to the marketing and sale efforts, the Revstone Group has been involved in arm's length negotiations with the Customers regarding certain needed financial accommodations that will permit the Revstone Group to continue operating while pursuing going concern sales, and to maximize the return resulting from such sales.  As a result of these multi-party discussions, certain of the OEMs and certain of the companies in the Revstone Group have entered into an Automotive Sale Transaction Support Agreement (the "Support Agreement").  Concurrent with the filing of this chapter 11 case, Metavation and Revstone have filed a motion seeking approval of the terms of the Support Agreement.  This Court's approval of the Support Agreement in each of Revstone and Metavation's chapter 11 cases is a necessary condition to its full effectiveness.

29.     The Support Agreement is designed for certain of the OEMs to provide significant accommodations and financing to maintain the continued production of automotive component parts and support the going concern sales of the assets of Metavation and certain other companies of the Revstone Group.  Additionally, the Support Agreement also includes a sale support payment that will defray significant claims against Revstone's subsidiaries, including Metavation, which will inure to the benefit of not only the subsidiaries, but Revstone as well, by eliminating claims that would otherwise be paid from the proceeds of the sales.

30.     The confidential and proprietary information set forth in the Support Agreement contains non-public information regarding the Revstone Group, the OEMs and the proposed sale of various non-debtor affiliates of Revstone and Metavation.  The details of the proposed sales (including, but not limited to, timing and pricing details) together with the OEMs support of those same sales contains information that if it were to become publicly available, could be used by competitors and/or litigants to gain access to crucial and proprietary information regarding Metavation, Revstone and the OEMs operations.  Thus, the specific terms of the Support Agreement have been filed under seal pursuant to Metavation's agreement with the OEMs.

### Proposed Sale to DAYCO

31.     Concurrent with and proceeding from the Revstone Group's ongoing negotiations with the OEMs, Metavation has undertaken significant efforts to market substantially all of its assets.  With Huron's assistance, Metavation formally commenced that process in October, 2012.  As noted above, Metavation retained Huron in October 2012 to

market its assets to potential buyers.  Marketing materials were prepared, an online data site with

diligence materials was expanded, and potential buyers were identified.  By January 7, 2013,

Metavation received four expressions of interest, and subsequently Metavation negotiated with

certain of the interested parties, with input from certain important customers.  Based on various

factors, including customer input, the Debtor ultimately focused on potential transactions with

two of the parties that had submitted expressions of interest.

        32.    As explained above, in January 2013, the respective operating agreements

of the Original Debtors and non-debtor Revstone Transportation, LLC and Revstone Tool &

Engineering, LLC were amended to implement certain changes relating to, among other things,

corporate governance.  As a result, as of such time, Metavation has been controlled by John

DiDonato, the Chief Restructuring Officer of Revstone Transportation, LLC (the sole member of

Metavation), and the restructuring committee (the "Restructuring Committee") of the board of

managers of Revstone Transportation, LLC (which Restructuring Committee is comprised of

independent managers, James Shein and Richard Newsted).   Further, the Restructuring

Committee approved a detailed asset disposition protocol which outlines the process (the "Sales

Protocol") employed by the Original Debtors and their subsidiaries, including Metavation, in

effectuating asset sales.  The Sales Protocol provides that the CRO, subject to the supervisory

authority of the Restructuring Committee, will manage the sale process, including marketing and

due diligence efforts, negotiation of sale agreements (with the assistance of the Original Debtors'

counsel), and consummation of any transactions.  The CRO is required to present any final asset

purchase agreement to the Restructuring Committee for approval before execution – which was done in this case in respect to the proposed sale.

33.     The Original Debtors have been in compliance with the Sales Protocol since its adoption, including the continued due diligence and negotiation related efforts of the CRO, as supervised by the Restructuring Committee, with respect to the potential sale of Metavation's assets.  As noted above, by early January 2013, after an extensive marketing process, Metavation received four expressions of interest, and subsequently, based on various factors, including customer input, the Debtor ultimately focused on potential transactions with two of the parties that had submitted expressions of interest.

34.     On June 4, 2013, the potential buyer, Dayco Products, LLC and Dayco Products S.A. de C.V. ("DAYCO"), submitted to Revstone Transportation, LLC, as the sole member of Metavation, a non-binding letter of intent ("LOI").  After further discussion between the parties, the DAYCO's June 4th LOI was modified, and after extensive review and consideration, the Debtor selected DAYCO's offer as set forth in its June 10, 2013 LOI as the best alternative for Metavation to maximize the value of its assets, and proceeded to negotiate with DAYCO the terms and conditions of a definitive purchase agreement.  After extensive negotiations, Metavation entered into an Asset Purchase Agreement with DAYCO on July 19, 2013.

35.     Concurrently with the filing of this case, the Debtor is filing a motion to seek the scheduling of certain hearings and activities that will permit an orderly and efficient sale of its assets to DAYCO, or to another purchaser who presents a higher and better bid for

16

Metavation's assets through a structured bid and auction process.  After filing its petition, the

Debtor intends to operate its business in the ordinary course to preserve the going concern value,

while pursuing the auction and sale of the Metavation assets.  In the various First Day Motions,

the Debtor seeks relief on an expedited basis that will help preserve the value of its assets and

permit them to conduct this case efficiently and economically.  The basis for each of the First

Day Motions is set forth below.

## PART II

### First Day Motions and Applications

      36.     In order to enable the Debtor to minimize the adverse effects of the

commencement of this chapter 11 case, the Debtor has requested various types of relief in the

First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in

each First Day Motion is set forth below.

      37.     I have reviewed each of these First Day Motions (including the exhibits

and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge,

information and belief, and I believe that the type of relief sought in each of the First Day

Motions:  (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption

to their current business operations; and (b) is essential to maximizing the value of the Debtor's

assets for the benefit of its estate and creditors.

**A.**    **Debtor's Motion for Order Directing Joint Administration**
     **of Related Chapter 11 Cases**

38.    Metavation is an affiliate of each of the Original Debtors.  I am informed by counsel that the joint administration of the Metavation case along with the cases of the Original Debtors will permit the Clerk of the Court to utilize a single general docket for all cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in significant savings to the estates.  Accordingly, I believe that the relief requested in the joint administration motion is in the best interests of the Metavation estate and the estates of the Original Debtors.

**B.**    **Application of Metavation, LLC Pursuant to 28 U.S.C. § 156(c) and Local Rule**
     **2002-1(f) for an Order Authorizing the Retention of Rust Consulting/Omni**
     **Bankruptcy as Claims and Noticing Agent**

39.    The Debtor seeks an Order authorizing and approving the retention and employment of Rust Omni to act as the claims and noticing agent to assume responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtor's case and provide the services set forth in detail in the motion.

40.    I understand that Rust Omni is one of the country's leading chapter 11 administrators with experience in noticing, claims processing, assisting with claims reconciliation and distribution.  I believe Rust Omni is well qualified to provide the Debtor with experienced noticing, claims and balloting services in connection with this case, and has substantial experience in the matters upon which it is to be engaged.

41.     Accordingly, I believe it is in the best interest of the Debtor's estate to
seek the entry of an order retaining and appointing Rust Omni as the agent for the Clerk and as
custodian of official court records and to perform such other services as may be required by the
Debtor.  Additionally, the Debtor seeks authorization to compensate Rust Omni for services
rendered and to reimburse Rust Omni for expenses incurred without further order of this Court
upon the Debtor's receipt of reasonably detailed statements of fees and expenses.

C.     **Debtors' Motion for an Order Authorizing (I) Maintenance of Existing Bank
       Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of
       Existing Cash Management System, and (IV) Waiver of Section 345(b) Deposit and
       Investment Requirements**

42.     The Debtor seeks authorization (1) to maintain its existing bank accounts
and to pay any prepetition routine banking fees imposed by the financial institutions where the
Debtor's bank accounts are maintained, (2) to continue to use its existing check stock and
business forms until exhausted, (3) to continue to use its existing cash management system, (4)
to continue performance of intercompany transactions and to provide administrative priority to
postpetition intercompany claims, and (5) for a limited waiver of the deposit and investment
guidelines imposed under section 345(b) of the Bankruptcy Code.

43.     The Debtor's cash management system is a network of a lockbox and
three bank accounts that facilitates the timely and efficient collection, management, and
disbursement of funds used in the Debtor's business.  Because of the nature of the Debtor's
operations and the disruption that would result if the Debtor was forced to close its existing
accounts, it is critical that the Cash Management System remain in place.

44.    <u>Collections</u>. Collections from revenues consist of check and wire payments made by the Debtor's customers. Customer payments made by check are sent to the lockbox established for the Debtor and maintained by Wells. Checks sent into the Lockbox are deposited by Wells Fargo on a daily basis into the Debtor's depository account. Customer payments by wire transfer are made directly to the Concentration Account. Available funds are swept from the Concentration Account by Wells Fargo each morning and applied as a payment against the Debtor's outstanding amounts then due under the prepetition loan facility to Wells Fargo.

45.    <u>Operating Account</u>. The operating account consists of funds advanced by Wells Fargo as additional loans under the prepetition loan facility. These funds are then used to process wire payments to trade vendors and for other expenses, including wire transfers to the payroll account maintained by the Debtor's payroll processor, Ceridian Corporation, and to make advances to the Disbursement Account to clear payments made by check

46.    <u>Disbursements</u>. The Debtor issues payments by check from its disbursement account. Funds are automatically transferred from the Operating Account as checks previously issued are presented to Wells Fargo for payment. No balance is maintained in the Disbursement Account with funds advanced from the Disbursement Account only as necessary to clear checks.

47.    The Debtor's Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtor in the exercise of their business judgment. The widespread use of this particular Cash Management System,

moreover, is attributable to the numerous benefits it provides, including the ability to (a) process

and timely pay expenses; (b) allow a mechanism for deposits from revenues; (c) ensure cash

availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by

facilitating the movement of funds and the development of timely and accurate balance and

presentment information.  In addition, preserving a "business as usual" atmosphere and avoiding

the unnecessary distractions that would inevitably be associated with a substantial disruption of

the Cash Management System will facilitate and enhance the Debtor's efforts to continue to

operate postpetition and maintain status quo in anticipation of the sale of substantial all of its

assets.

      48.     I believe that maintenance of the Bank Accounts will greatly facilitate the

Debtor's operations in chapter 11.  As noted above, all revenues and income realized by the

Debtor ultimately flows into the Concentration and Operating Accounts and are disbursed

through an interlinked Cash Management System.  If the Bank Accounts were closed, the Debtor

would have to open new accounts and then attempt to arrange alternative electronic and manual

payment procedures for payments into and out of the Debtor's accounts, which would

completely disrupt the flow of postpetition receipts and disbursements.  In addition, closing the

Bank Accounts would require the Debtor to cancel and reinstitute wire transfer instructions

which would be difficult to modify under exigent circumstances.  I believe that these disruptions

would severely impact and could irreparably harm the Debtor's ability to operate its business at

this critical juncture.  To avoid disruptions and delays in the operation of the Debtor's business,

the Debtor should be permitted to maintain its existing Bank Accounts and, if necessary, to open

new accounts as debtor in possession accounts or to close any unneeded existing accounts.

49.    To minimize expense to its estate, the Debtor seeks authority to continue

to use all correspondence and business forms until such time as the Debtor can effectuate the

necessary changes to their pre-printed and computer-generated forms in order to add the "debtor

in possession" label. I believe it is appropriate that the Debtor continue to utilize its existing

business forms without disruption to conserve estate resources.

50.    Prior to the Petition Date, the Debtor engaged in intercompany financial

transactions in the ordinary course of business with the Original Debtors and other affiliates as

part of a consolidated Cash Management System. At any given time, there may be balances due

and owing from among the Debtor, Original Debtors and other non-Debtor affiliates. These

balances represent extensions of intercompany credit made in the ordinary course of business

and are an essential component of the Cash Management System. The Debtor maintains records

of these transfers of cash and can ascertain, trace and account for these Intercompany

Transactions. The Debtor, moreover, will continue to maintain such records, including records

of all current intercompany accounts receivable and payable. I believe it will be critically

important that the Debtor be allowed to maintain its intercompany practices.

51.    Finally, because of the nature of their operating business, the Debtor may,

at certain times, have funds accumulated in the Bank Accounts that exceed the limits provided in

the Bankruptcy Code, and therefore necessitate a waiver of these limits. The waiver would

permit the Debtor to maintain its Bank Accounts without posting a bond or other security, as

would otherwise be required under section 345(b) whenever the funds on deposit exceed the

amount permitted under section 345(b).  I have been informed that the Bank Accounts are (a)

covered by FDIC insurance and contain amounts which are within the limits of such insurance,

and/or (b) with financial institutions which have standing collateralization agreements with the

office of the United States Trustee.  To the extent needed for a particular Bank Account, the

Debtor will work with the various financial institutions to put acceptable collateralization

agreements in place or otherwise satisfy the requirements of the Bankruptcy Code.

**D.**    **Motion of Debtor Metavation, LLC for Order Under Sections 105, 363, and 507 of the Bankruptcy Code (I) Authorizing Payment of Prepetition Wages, Salaries, Employee Benefits and Reimbursable Expenses, (II) Authorizing Continuation of Employee Benefit Plans and Programs Postpetition, and (III) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations**

52.    The Debtor currently employs 270 full-time employees in hourly, salaried,

supervisory, management, sales, administrative, and operational positions to perform the

functions necessary to effectively and efficiently operate the Debtor's business.  As of the

Petition Date, the Debtor employed approximately 57 salaried and 213 hourly Employees.  To

minimize the personal hardships that the Employees may suffer if their prepetition employment-

related obligations are not paid or honored, to maintain Employee morale during this critical

time, and to minimize disruptions to the Debtor's ongoing business operations, the Debtor, by

this Motion, seeks authority (but not direction) to:  (i) pay unpaid prepetition claims for wages,

commissions and salaries to the Employees; (ii) remit applicable withholding obligations to the

proper third parties; (iii) honor and maintain certain benefits (as more fully set forth below)

offered by the Debtor; (iv) reimburse certain unpaid business expenses incurred prepetition by

the Employees; and (v) pay all costs incident to the foregoing as set forth in detail below.

53.    In addition, the Debtor is party to a collective bargaining agreement with

the United Steelworkers International affiliated with American Federation of Labor Congress of

Industrial Organizations. USW International Local Union 564 represents the 64 hourly

Employees employed by the Debtor at the grey steel foundry located in Vassar, Michigan. The

Debtor requests the authority to continue to honor all obligations to these union Employees under

the terms of the existing collective bargaining agreement to which the Debtor is a party.

54.    In addition to the Employees, the Debtor also relies on approximately 102

temporary or contract workers to supplement critical needs in employee staffing. These

Temporary Workers provide the Debtor with the flexibility to adjust their workforce to meet

marketplace demand on a cost-effective basis. The Employees' and Temporary Workers'

valuable skill sets, institutional knowledge, and understanding of the Debtor's operations make

them essential to the Debtor's ability to preserve the value of its business. The Debtor requests

the authority to honor its prepetition obligations to the Temporary Workers, whether paid to

directly to such Temporary Workers or through an employment agency that employs such

Temporary Workers.

55.    I believe that it is in the best interests of its estate for this Court to

authorize the payments and honoring of the obligations requested herein. These obligations and

benefits in respect of the Debtor's employees may include, without limitation, (a) unpaid

prepetition wages, salaries and reimbursable business expenses earned or incurred prior to the

Petition Date; and (b) employee health and welfare benefit claims arising before the Petition

Date including, without limitation, (i) medical, dental, vision and prescription drug coverage; (ii)

health savings accounts and flexible spending accounts for health and dependent care under

Section 125 of the Internal Revenue Code; (iii) basic life, voluntary life insurance; (iv) accidental

death and dismemberment insurance; (v) short-term and long-term disability benefits; (vi)

counseling, (vii) a 401(k) savings plan, (viii) voluntary accident injury insurance, (ix) voluntary

critical injury coverage and (x) paid time off.

56.    I believe it is important to honor the Debtor's existing obligations to its

employees and to continue to provide the package of benefits to their Employees after filing of

this Chapter 11 case. Many Employees live from paycheck to paycheck and rely exclusively on

receiving their full compensation or reimbursement of their expenses in order to continue to pay

their daily living expenses. These Employees may be exposed to significant financial and

healthcare related problems if the Debtors are not permitted to pay and/or honor the Unpaid

Wages and Benefits, and the expenses associated therewith, in the ordinary course of the

Debtors' business. Moreover, I believe that if the Debtor is unable to honor accrued Unpaid

Wages and the Employee Benefits, including honoring earned PTO time, Employee morale and

loyalty will be jeopardized at a time when Employee support is critical.

57.    If the Debtor is not authorized to pay for medical benefits, then many of

the Debtor's Employees may not be reimbursed or otherwise have their medical benefits claims

paid. In addition, certain Employees may become primarily obligated for the payment of these

claims in cases where health care providers have not been reimbursed. I believe that potentially

enormous hardship could be visited upon these employees if the Debtor is not authorized to honor the resultant Medical Plan Contributions. The Debtor believes the uncertainty regarding the payment of Medical Plan Contributions will cause significant anxiety at precisely the time the Debtor needs its Employees to perform their jobs at peak efficiency.

58.    The Employer Payroll Taxes and other amounts either voluntarily or involuntarily withheld from Employee paychecks principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntary Deductions), and judicial authorities (in the case of involuntary Deductions), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtor expects inquiries from garnishers regarding the Debtor's failure to submit, among other things, child support and alimony payments, which are not the Debtor's property but, rather, have been withheld from Employee paychecks. Moreover, if the Debtor cannot remit these amounts, the Employees may face legal action due to the Debtor's failure to submit these payments.

59.    I believe that the Employees have an intimate knowledge of the operation of the Debtor's business and are critical components to the success of this Chapter 11 Case. I believe that deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtor and their ability to maximize the value of their assets. Satisfaction of the Unpaid Wages and Employee Benefits is necessary to maintain the Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

**E.    Motion of Debtor Metavation, LLC For An Order (I) Authorizing, But Not Directing, The Debtor To Pay Certain Prepetition Taxes In The Ordinary Course Of Business And (II) Authorizing Banks And Financial Institutions To Honor And Process Checks And Transfers Related Thereto**

60.    The Debtor seeks entry of an order authorizing, but not directing, the Debtor to pay any prepetition Taxes to the respective Taxing Authorities in the ordinary course of the Debtor's business including, without limitation, Taxes subsequently determined on audit to be owed for periods prior to the Petition Date.

61.    In the ordinary course of business, the Debtor incurs and pays certain taxes, in particular, real property and personal property taxes from taxing authorities in Michigan in the ordinary course of the Debtor's business, as described below.  The Debtor incurs and pays real property taxes to the taxing authorities in the state of Michigan in connection with its real property facilities located in Michigan.  The Debtor also incurs and pays personal property taxes on certain equipment to the state of Michigan. Generally, the Debtor remits payments for the Taxes on a bi-annual basis.  As of the Petition Date, the Debtor believes it may owe approximately $272,000.00 in unremitted Taxes.

62.    I have been informed by my counsel that the Court should grant the Debtor the authority to pay the Taxes because: (i) portions of the Taxes are not property of the estate; (ii) portions of the Taxes may be entitled to priority status pursuant to the Bankruptcy Code; (iii) the Taxing Authorities may file liens, initiate audits, or otherwise proceed against Debtor for unpaid Taxes and such actions will distract the Debtor from reorganization efforts; and, (iv) the Bankruptcy Code and the Court's general equitable powers permit the Court to grant such relief.

63.    I believe that the Debtor's failure to remit the Taxes could adversely affect the Debtor's business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtor or prevent the Debtor from continuing its business, which, even if unsuccessful, would unnecessarily divert the Debtor's attention from the bankruptcy process; (b) the Taxing Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estates; and (c) certain directors and officers might be subject to personal liability — even if such a failure to remit such Taxes was not a result of malfeasance on their part — which would undoubtedly distract these key employees from their duties related to the Debtor's bankruptcy.

64.    If Taxes are not paid, I believe the Debtor will be at risk for immediate business disruptions that would result from, among other things, (i) any liability of the directors and officers for failures to remit any Taxes that may constitute "trust fund" taxes, (ii) the administrative disruption of unnecessary local audits, and (iii) any operational disruptions or challenges to the Debtor's right to operate within certain jurisdictions where the Taxes were not paid.  I believe that addressing any potential subsequent action taken by those Taxing Authorities would be costly, would place an administrative burden on management, and divert management's attention from the reorganization process.  Thus, I believe that the Debtor is entitled to immediate authorization for the payment of the Taxes.

F.     **Motion of Debtor Metavation, LLC for an Order Authorizing, But Not Directing, Payment of Certain Prepetition Shipping Obligations in the Ordinary Course of Business**

65.     The Debtor seeks entry of an order authorizing, but not directing, the Debtor, in its business judgment, to pay prepetition obligations owed to Automated Logistics System for shipping charges incurred by the Debtor, including those that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtor to such Shipper for services performed and/or goods that were delivered to the Debtor prior to the Petition Date. The Debtor proposes to pay such claims, when, in the Debtor's sole discretion, the Shipper's exercise of contractual or statutory self-help remedies would unduly disrupt the Debtor's business. The Debtors request the authority, but not the direction, to pay up to $264,000.00 on account of such claims.

66.     Because the Debtor's business depends on the constant supply of product or materials, I believe that even minor disruptions in the shipping process could be disastrous for the going concern value of the Debtor's business. The Debtor submits that the Shipper could demand immediate payment from the Debtor. Even absent a valid lien, I believe a Shipper's mere possession (and retention) of the Debtor's product of materials could severely disrupt the Debtor's operations. Accordingly, the Debtor requests authority to pay certain prepetition claims relating to the Shipper that I believe is necessary or appropriate to (a) obtain release of critical or valuable products that may be subject to liens, (b) maintain a reliable, efficient and smooth shipping system, and (c) induce the Shipper to continue to carry product and make timely delivery. Notably, the Debtor only seeks authority, not direction, to make such payments.

67.    I believe the Debtor is entitled to immediate relief for payment of existing obligations to the Shippers because the Debtor's business depends on the timely and accurate shipping of product and materials to operate successfully. I believe that any disruption in the shipping process would immediately damage the value of the Debtor's business.

**G.    Motion for Authorization to (I) Continue Prepetition Insurance Program and (II) Pay Any Prepetition Premiums and Related Obligations**

68.    The Debtor seeks authority (but not direction) to make the payments required to continue its Insurance Program, including (i) payment of any prepetition premium, in whole or in part, or other obligations under its active policies to the extent the Debtor determines, in its discretion, that such payments are necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, proceeds, or other rights or interests provided under the Policies, and (ii) payment of any fee owed to the Broker necessary to continue the administration of the Insurance Programs.

69.    In the ordinary course of its business, the Debtor maintains and participates in a carefully designed insurance program. This program includes eleven insurance policies that were in effect as of the Petition Date, providing millions in dollars of coverage, including, but not limited to, policies covering general liability, umbrella coverage, workers' compensation, executive risk management, employed lawyers professional liability, and directors' and officers' liability. The Debtor, the Original Debtors and certain non-debtor affiliates are responsible for approximately $4,656,712 per year in aggregate premiums and

related fees to maintain the Insurance Program. The Debtor's annual portion of the aggregate

premiums and related fees is approximately $1,444,436.72. These Policies provide insurance

coverage for the Debtor, Original Debtors and certain non-debtor affiliates. Fifteen percent of

the premiums are paid in the first month of the year followed by nine equal monthly installments.

The continuation of these policies is both necessary and critical to the Debtor's ability to

operate its business.

70.     The Debtor, Original Debtors and non-debtor affiliates use Todd

Associates, Inc. to procure and coordinate their insurance coverage. The Broker's services

are critical to maintaining and renewing the various component policies within the Insurance

Program. As part of its services, the Broker handles all administrative tasks involved with the

routing and payment of premiums to the Carriers. Payment of the premiums to the Broker is

allocated among the Debtor, Original Debtors and non-debtor affiliates, and any payments

made by the Debtor, Original Debtors and non-debtor affiliates on behalf of another affiliate

create an intercompany obligation between such affiliates. The Broker's fee is directly

subsumed in the billings for premiums it provides to the Debtor, Original Debtors and non-

debtor affiliates.

71.     By obtaining the required insurance coverage for itself, the Original

Debtors and non-debtor affiliates on a combined basis, the Debtor has been able to realize

substantial savings and efficiencies in the cost of its Insurance Program generally. I believe

that it would not be feasible to separate out its operations and other insurance needs from

those of the Original Debtors and non-debtor affiliates and obtain replacement insurance

coverage at a reasonable cost or within a reasonable time frame without exposing the Debtor

to significant risk of disruption and increased expense. Furthermore, in many cases, I have

been informed by counsel that the coverage provided by the Policies is required by various

regulations, laws and contracts that govern the Debtor's business under applicable

non-bankruptcy law. Likewise, the U.S. Trustee Guidelines require the Debtor to maintain

adequate insurance coverage. I have been informed that such coverage could not be provided

without continuation of the Insurance Program. Thus, the Debtor requires immediate

authorization to continue its Insurance Program and make all payments required thereunder.

**H.      Motion Of The Debtors For An Order Under Section 366 Of The Bankruptcy Code
(A) Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service,
(B) Deeming Utilities Adequately Assured Of Future Performance, And (C)
Establishing Procedures For Determining Adequate Assurance Of Payment**

72.      In the normal course of business, the Debtor has relationships with various

utility companies and other providers for the provision of telephone, gas, electricity and related

services. The Debtor estimates that their average monthly postpetition payments to the Utility

Providers will aggregate approximately $273,049.24. Because uninterrupted Utility Services are

critical to the Debtor's ongoing operations, the Debtor seeks the entry of an order:  (a)

prohibiting the Utility Providers from altering, refusing or discontinuing services; (b) deeming

Utility Providers adequately assured of future performance; and (c) establishing procedures for

determining adequate assurance of future payment.

73.      In order to provide adequate assurance of payment for future services to

the Utility Providers, the Debtor proposes to make a deposit (a "Utility Deposit") equal to 50%

of the Debtor's estimated cost of its monthly utility consumption to each Utility which the

Debtor intends to continue to utilize during the course of this case.  The Debtor estimates that the

Utility Deposits, in the aggregate, will total approximately $136,524.62.  The Debtor proposes to

make Utility Deposits to each of the Utility Providers within fourteen days after the entry of an

interim order, pending further order of the Court, for the purpose of providing each Utility

Provider with adequate assurance of payment of its postpetition services to the Debtor.  In

addition, the Debtor seeks to establish reasonable procedures by which a Utility Provider may

request additional adequate assurance of future payment, in the event that such Utility Provider

believes that its Utility Deposit does not provide it with satisfactory adequate assurance.

74.     It is my belief that the Debtor cannot continue to operate without

continued Utility Services.  If any of the Utility Providers alter, refuse or discontinue service,

even for a brief period, the Debtor's business operations would be severely disrupted.  In

contrast, the Utility Providers will not be prejudiced by the continuation of their services and will

be paid all postpetition utility charges.  It is therefore critical that Utility Services continue

uninterrupted.  I believe that such relief is in the best interests of the Debtor's estate.

I.     **Debtor's Motion Pursuant To Sections 105, 361, 362, 363 And 507 Of The
Bankruptcy Code, Bankruptcy Rule 4001 And Local Rule 4001-2 For Entry Of
Interim And Final Orders (I) Authorizing Debtors To Obtain Postpetition
Financing And Use Cash Collateral, (ii) Granting Adequate Protection, (iii)
Scheduling A Final Hearing, And (Iv) Granting Certain Related Relief**

75.     Metavation, LLC, the above-captioned debtor and debtor in possession

seeks entry of an interim order on an expedited basis and, following a final hearing to be set by

the Court, entry of a final order authorizing the Debtor to obtain secured postpetition

superpriority financing and use cash collateral on an interim and final basis pursuant to the terms

and conditions of that certain Ratification and Amendment Agreement by and among the Debtor,

certain non-debtor affiliates as co-borrowers and guarantors that are parties to the existing

prepetition Credit Agreement, Wells Fargo Capital Finance, N.A., as lender and as agent for each

Lender party thereto, including without limitation the Existing Junior Participants and the DIP

Junior Participants.

76.     Specifically, the Debtor seeks the entry of the Interim Order, which:

(i)     authorizes the Debtor to obtain the secured postpetition

superpriority DIP Facility on an interim basis pursuant to the terms and conditions of the DIP

Agreement and the DIP Loan Documents;

(ii)     authorizes the Debtor to execute the DIP Loan Documents, and to

perform such other acts as may be necessary or desirable in connection therewith;

(iii)     grants to the Agent, for itself and for the ratable benefit of the

Lenders, first priority security interests in and liens on all of the DIP Collateral (as defined

below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under

the DIP Loan Documents, as applicable, and the DIP Orders, as applicable, subject only to

Permitted Encumbrances;

(iv)     grants allowed superpriority administrative expense claims to the

Agent and the Lenders;

(v)     authorizes the Debtor to use cash collateral in which (a) the Agent

on behalf of the Lenders has or asserts an interest under that certain Credit Agreement, dated as

of July 23, 2010  among (i) the Debtor, (ii) certain non-debtor affiliates of the Debtor, Contech

Castings, LLC, MPI, LLC, and MW Texas Die Casting, Inc., as co-borrowers, (iii) certain non-

debtor affiliates of the Debtor, as guarantors, (iv) the Lenders and (v) the Agent and (b) the

Pension Benefit Guaranty Corporation has or asserts an interest under that certain Notice of

Liens and Claims dated April 24, 2013, which asserted interest has been consensually

subordinated by agreement of the parties that provides for payment to the PBGC as set forth in

such agreement;

   (vi) authorizes the Debtor to grant adequate protection the Agent on

behalf of the Lenders for any decrease from and after the Petition Date in the value of its interest

in the Debtor's property resulting from (i) the use, sale or lease of the Debtor's property

(including the use of Cash Collateral), (ii) the Carve-Out (hereinafter defined), or (iii) the

imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

   (vii) modifies the automatic stay to the extent necessary to implement

and effectuate the terms and provisions of the Interim Order;

   (viii) waives any applicable stays under the Bankruptcy Rules and

provides for the immediate effectiveness of the Interim Order; and

   (ix) schedules a hearing to consider entry of the Final Order, inter alia,

approving and authorizing the DIP Facility (including, without limitation, the advance of the

financing pursuant to the Interim Order) on a final basis pursuant to the DIP Loan Documents.

   77. The Debtor faces severe liquidity restraints and was forced to file this

chapter 11 case to preserve the value of its assets.  The Debtor is not able to obtain alternative

financing from outside parties and the current proposal was on the terms that were most beneficial to the estate. Indeed, without the agreement of the Lenders to provide the Debtor with postpetition financing, the Debtor's liquidation would have to be conducted in chapter 7, and rather than an orderly liquidation, without the possibility of a going concern sale, the assets would be abandoned, without security. Instead, with the DIP Facility, the Debtor intends to implement an orderly sale process that will maximize the value of its estate assets in a responsible manner.

78.     The Debtor requires the DIP Facility to provide the Debtor with the necessary capital with which to operate its business, including funding the Debtor's obligations to employees, and to successfully consummate its proposed sale under chapter 11. Cash is necessary for working capital and capital expenditures, and operating costs and expenses incurred during this case. The Debtor does not have sufficient sources of working capital, financing or Cash Collateral to carry on the operation of its business without the DIP Facility. The Debtor's ability to maintain its business is dependent on its ability to continue to operate, and the Debtor cannot operate unless it can fund payments for postpetition goods, services and other operating expenses. Thus, I believe that the DIP Facility is essential to the Debtor's continued viability and the value of its business as a going concern and will provide the Debtor with the opportunity to successfully consummate the sale of its assets.

79.     The DIP Facility was negotiated in good faith and at arm's-length between the Debtor and its secured lenders, resulting in an agreement designed to permit the Debtor to maximize the value of its assets through an orderly sale process. I believe that the proposed

36

adequate protection provided by the DIP Facility is fair and reasonable and compensate the

Agent, the Lenders and the PBGC for any possible diminution in value of the Debtor's assets

securing the obligations under the Prepetition Credit Facility. Given the significant value that

the Debtor stands to lose in the event it is denied access to continued use of Cash Collateral, I

believe that such protections are wholly appropriate and justified.

80.     I believe that the Debtor has an urgent and immediate to obtain DIP

Facility. The Debtor does not have sufficient funds on hand or generated from its business to

fund its operations, without the postpetition financing and the use of Cash Collateral that the DIP

Facility will provide, the Debtor will not be able to continue operations. Specifically, without

the DIP Facility, including both the financing and the use of Cash Collateral derived from the

Debtor's operations which is subject to the Agent's and the PBGC's liens and security interests

and comprises Cash Collateral, the Debtor will not have any liquidity to operate its business,

fund its ordinary course expenditures, including paying its employees, or to pay the expenses

necessary to administer the chapter 11 case. Simply put, without the postpetition financing and

continued use of Cash Collateral afforded by the DIP Facility, the Debtor will be required to

cease operations and liquidate on a piece meal basis, causing irreparable harm to the Debtor, and

its estate and creditors. Furthermore, the Debtor has sought and was unable to obtain financing

from another lender on terms preferable the DIP Facility.

81.     Finally, I believe that the urgent need to preserve the Debtor's business,

and avoid immediate and irreparable harm to the Debtor's estate, makes it imperative that the

Debtor be authorized to obtain the postpetition financing and use the Cash Collateral as of the

Petition Date, pending the Final Hearing, in order to continue its operations and administer the

Debtor's chapter 11 case.  Without the ability to obtain the postpetion financing and use Cash

Collateral, the Debtor would be unable to meet its postpetition obligations and would be unable

to fund its working capital needs, thus causing irreparable harm to the value of the Debtor's

estate and jeopardizing the Debtor's sale efforts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 22, 2013

By:  John C. DiDonato
Title:  Chief Restructuring Officer
Metavation, LLC