**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------x
                                          :
```
*In re*                                   :    **Chapter 11**
                                          :
**ROTECH HEALTHCARE INC.,** *et al.,*     :    **Case No. 13-_____  (   )**
                                          :
　　　　　　　**Debtors.**[1]              :    **Joint Administration Requested**
                                          :
```
------------------------------------------------------------x
```

**DECLARATION OF STEVEN P. ALSENE IN SUPPORT**
**OF DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS**

Steven P. Alsene declares as follows:

1.　　　　I am the President and Chief Executive Officer ("CEO") of Rotech

Healthcare Inc. ("Rotech" or the "Company") and President of each of its title 11 subsidiaries

(collectively with Rotech, the "Debtors").  On the date hereof (the "Commencement Date"), each

of the Debtors is commencing a voluntary case under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code").  I am familiar with the day-to-day operations, business, and

financial affairs of the Debtors, having served as President and CEO of Rotech and as a member

of the board of directors of Rotech since January 1, 2013.  Prior to serving as President and CEO

of Rotech, I served as its Chief Operating Officer from January to December 31, 2012, and as its

Chief Financial Officer and Treasurer from September 2006 to December 2011.  Prior to my

formal appointment as Chief Financial Officer and Treasurer, I served in such capacity on an

interim basis from June to August 2006.  I joined Rotech in June 2003 as the Vice President of

Internal Audit and have also served as Rotech's Vice President of Finance.  From June 1999 to

---

[1] The Debtors in these chapter 11 cases are listed in Schedule 1 and at http://dm.epiq11.com/rotech.  The address of the corporate headquarters of the Debtors and the mailing address of each of the Debtors is 2600 Technology Drive, Suite 300, Orlando, FL 32804.

June 2003, I was the Head of Corporate Audit Services of Harcourt Education, a division of

Reed Elsevier PLC.  From 1992 to 1999, I served in various audit department capacities

including audit manager with PricewaterhouseCoopers LLP.  My educational and professional

qualifications include a Bachelor of Science in Accounting from Florida State University and a

Masters in Accounting from Florida State University.  I am also a certified public accountant in

the State of Florida.

2.      I submit this declaration (the "Declaration") to provide the Court and other

parties in interest with an overview of the Debtors' businesses and to describe the circumstances

compelling the commencement of these chapter 11 cases.  I also submit this Declaration in

support of the first day motions and applications (collectively, the "First Day Pleadings") filed

by the Debtors contemporaneously herewith, or as soon as reasonably practicable hereafter, by

which the Debtors seek relief enabling the Debtors to continue as going concerns, to operate

effectively, to minimize certain of the potential adverse effects of the commencement of their

chapter 11 cases, and to preserve and maximize the value of the Debtors' estates.  I submit this

declaration based on my own personal knowledge, except as expressly provided, and as my

testimony if called to testify.

A.      **Rotech's Businesses**

3.      Rotech is one of the largest providers of home medical equipment and

related products and services in the United States, with a comprehensive offering of oxygen and

other respiratory therapy equipment and services.  The Debtors provide equipment and services

principally to elderly patients with breathing disorders, most typically associated with chronic

obstructive pulmonary diseases ("COPD").  COPD is a group of diseases of the lungs in which

the airways become narrowed.  This leads to a limitation of the flow of air to and from the lungs,

causing shortness of breath.  COPD is the fourth most common cause of death in the United

States.  The two main forms of COPD are chronic bronchitis and emphysema.

        4.      Rotech provides equipment and services nationwide, primarily in non-

urban markets in all 50 states and the District of Columbia.  The Company's equipment and

services are sourced through approximately 409 operating locations in 47 states.  As of the

Commencement Date, the Debtors employed approximately 4,000 employees.  While the

Debtors' operations are geographically widespread, they are organized into three geographic

divisions, nine regions and 48 areas.  The Debtors have centralized billing and collection

functions into eight billing centers.  Rotech also provides centralized corporate control over

purchasing, payables, payroll, human resources, compliance, development of policies and

procedures, real estate, information systems, accounting, legal, and financial reporting.  This

structure provides control and consistency among divisions and operating locations and allows

the Company to implement standard policies and procedures across a large number of

geographically remote operating locations.  At the same time, the Company is able to preserve

the localized operating structure necessary to maintain the personalized customer and referral

relationships characteristic of the home health care business.

**B.**    **Rotech's Services and Products**

    **(i)**    **Oxygen and Other Respiratory Therapy Equipment and Services**

        5.      The rental and sale of oxygen and other respiratory therapy equipment and

services represented 87.5% of Rotech's net revenues for the 12-month period ending December

31, 2011.[2]  Patients in need of oxygen and other respiratory therapy equipment and services

typically suffer from breathing disorders, such as COPD, obstructive sleep apnea and other

---

[2] As of the Commencement Date, the Debtors have not filed their Form 10-K for the fiscal year ended on December 31, 2012.

cardiopulmonary disorders.  Individuals diagnosed with COPD or similar diseases generally will require treatment for the rest of their lives.  The majority of Rotech's oxygen and other respiratory therapy equipment is rented and reimbursed on a monthly basis.

6.      Typically, patients are referred to Rotech by their physician or a hospital discharge planner.  Upon receipt of a referral, Rotech's local customer service representative obtains the necessary medical and insurance coverage information, and assignment of benefits, and coordinates equipment delivery.  Equipment delivery and setup are performed in the patient's home by one of Rotech's patient service technicians or clinicians who then provides instruction and training to the patient and the patient's family regarding appropriate equipment use and maintenance, and compliance with the prescribed therapy.  Following the initial delivery and setup, Rotech's patient service technicians or clinicians make periodic visits to the patient's home, the frequency of which is dictated by the type of therapy prescribed and physician orders. All services and equipment are coordinated with the prescribing physician and, during the period that Rotech provides services and equipment for a patient, the patient remains under the physician's care and medical supervision.  Respiratory therapy is monitored by licensed respiratory therapists and other clinical staff as prescribed by physicians and in accordance with applicable state laws.  Rotech provides 24-hour on-call support to its patients through a centralized after-hours call center located in Murray, Kentucky.

(a)      *Home Oxygen Equipment*

7.      Rotech offers a variety of oxygen delivery systems to accommodate patients' needs.  Each system and combination has different characteristics that make it more or less suitable to specific patient applications.

- *Oxygen Concentrator*: An oxygen concentrator is an electrically powered device that separates oxygen from room air and converts the oxygen into a more pure form.  It is small, reliable and generally provides the least expensive supply of oxygen to the patient.  The

4

concentrator is not an ambulatory product.  It stays in the room in which it is placed, and patients use different lengths of oxygen tubing to continue to receive oxygen while moving around.

- *Portable Oxygen Concentrator*:  A portable oxygen concentrator works in the same way as a regular oxygen concentrator, but with the addition of a battery and AC/DC adapter.  Portable concentrators are generally used for travel purposes and not as the primary oxygen system in the patient's home.

- *Liquid Oxygen*:  Liquid oxygen is delivered to the patient's home in a base unit that may also serve as the patient's primary source of oxygen while at home and can be used to fill a smaller portable unit when the patient leaves home.  Conventional liquid oxygen vessels require no power source to operate, making it an appropriate choice for patients in areas with frequent power outages.  Conventional liquid oxygen systems are quiet and have no major moving parts.  However, when the conventional liquid oxygen base unit is used as the primary oxygen source, it needs to be refilled approximately every two weeks, depending on the patient's consumption rate and liter flow.

- *High Pressure Oxygen Cylinders*:  High Pressure Oxygen Cylinders come in various sizes and are used as backup systems and when an oxygen concentrator patient travels outside the home.

- *Homefill System*:  A homefill system is used in conjunction with an oxygen concentrator.  The homefill unit allows the patient to fill his or her own oxygen cylinders at home using oxygen generated by their oxygen concentrator.

(b)    ***Other Respiratory Therapy Equipment and Services***

8.    In addition to home oxygen, Rotech also provides other home respiratory

therapy equipment and services to its patients, including:

- *Continuous Positive Airway Pressure ("CPAP") Devices*:  CPAPs are primarily used for the home treatment of obstructive sleep apnea.  Obstructive sleep apnea occurs when the upper airway becomes narrow as the muscles relax naturally during sleep.  This reduces oxygen in the blood and causes arousal from sleep.  The CPAP machine stops this phenomenon by delivering a stream of compressed air by a hose to a nasal pillow, nose mask or full-face mask, keeping the airway open under air pressure so that unobstructed breathing becomes possible, reducing and/or preventing apneas.

- *CPAP Supplies*: CPAPs include component parts and supplies which require routine replacement to ensure proper functioning of the CPAP device and infection control.  The supplies include hoses, masks, filters, chin straps, pillows, cushions and humidification units.  Hoses and masks accumulate exfoliated skin and particulate matter, and can develop mold, all of which may reduce the effectiveness of the unit or expose the patient to infection risk.  Such parts need to be cleaned or replaced on a regular basis. Most units also employ some type of filtration, and the filters also require regular maintenance.

5

- *Bi-level Positive Airway Pressure ("BiPap") Devices and Supplies*: BiPAPs are likewise used for the home treatment of sleep apnea for patients who cannot tolerate use of a CPAP.  With a BiPAP, air delivered through a mask can be set at one pressure for inhaling and another for exhaling.  This makes a BiPAP much easier for users to adapt to, as they do not have to exhale against extra air pressure as they do with a CPAP.  Because of these dual settings, BiPAPs allow people to get more air in and out of the lungs without the natural muscular effort needed to do so.  BiPAPs have been found to be especially useful for patients with congestive heart failure and lung disorders.  BiPAPs include the same component parts and supplies as a CPAP, which require routine replacement to ensure proper functioning.

- *Non-invasive Positive Pressure Ventilator ("NiPPV") Devices and Supplies*:  NiPPV refers to delivery of mechanically assisted or generated breaths without placement of an artificial airway, such as an endotracheal tube. In most cases, ventilation is delivered via a tightly fitting nasal mask.  NiPPVs include the same component parts and supplies as a CPAP and BiPAP, which require routine replacement to ensure proper functioning.

- Nebulizer Devices and Medications:  A nebulizer is a device used to administer medication to people in the form of a mist inhaled into the lungs.  Nebulizer medications are distributed in unit dose vials.  Typically patients with COPD are prescribed some combination of the following nebulizer medications: Albuterol, Ipratropium, Brovana®[3], Perforomist®[4] and/or Budesonide. Rotech manages its nebulizer medication business through its centralized pharmacy and call center operations in Murray, Kentucky.

(ii)     **Durable Medical Equipment**

9.      The rental and sale of durable medical equipment ("DME") represented 10.6% of Rotech's net revenues for the 12-month period ending December 31, 2011.[5]  DME includes hospital beds, wheelchairs, walkers, patient aids and other ancillary supplies.  Typically, lower cost items, such as patient aids and walkers, are sold, and higher cost items, such as hospital beds and wheelchairs, are rented.  Rotech considers DME to be a complementary offering to respiratory therapy equipment and related services.

---

[3] Brovana is a registered trademark of Sepracor Inc.

[4] Perforomist is a registered trademark of Dey Pharma, L.P.

[5] The remaining 1.9% of Rotech's net revenues is derived from enteral and advertising.

C.      **Rotech's Revenue Sources**

10.      Rotech derives its revenues principally by reimbursement from third-party payors.  Rotech accepts assignment of insurance benefits from patients and, in most instances, invoices and collects payments directly from Medicare, Medicaid, commercial payors, the Department of Veterans Affairs (the "VA"), and private insurance carriers, as well as directly from patients under co-insurance provisions. The following table sets forth Rotech's payor mix for each of the years ended December 31:

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| Medicare | 39% | 41% | 42% |
| Commercial payors | 38% | 38% | 38% |
| Department of Veterans Affairs | 11% | 10% | 10% |
| Medicaid | 7% | 7% | 6% |
| Private payors | 5% | 4% | 4% |

11.      As illustrated in the chart below, the Company has experienced annual net revenues averaging in excess of $493,000,000 over the past five years.



12.      The Company contracts with insurers and managed care entities on a local, regional, and national basis.  The Company generally contracts with those insurers and managed care entities having a significant patient population across numerous geographic regions, typically on a fee-for-service basis.  Under existing Medicare laws and regulations, the sale and rental of the Company's products is generally reimbursed by the Medicare program according to

prescribed fee schedule amounts calculated using statutorily-prescribed formulas.  Pursuant to

contracts with the VA, the Company provides equipment and services to persons eligible for VA

benefits in those geographic regions covered by the contracts.  The VA contracts typically

provide for an annual term, subject to three, four or five one-year renewal periods unless

terminated or not renewed by the VA.

### Overview and History of the Debtors' Prepetition Capital Structure[6]

**A.**    **Rotech was Significantly Leveraged at Inception**

13.    Rotech Medical Corporation ("RMC"), Rotech's predecessor, was

founded in 1981.  In October 1997, RMC was acquired by Integrated Health Services, Inc.

("IHS"), a large, publicly-held provider of post-acute and related specialty health care services

and products.  Following the acquisition, RMC operated as a wholly owned subsidiary of IHS.

On February 2, 2000, IHS and substantially all its subsidiaries, including RMC, filed for chapter

11 with the United States Bankruptcy Court for the District of Delaware.  RMC filed for chapter

11 relief because it was a guarantor of IHS's $2.3 billion of debt.  In 1999, IHS defaulted on its

debt obligations triggering RMC's guaranty obligations.  RMC's plan was confirmed on

February 13, 2002 and went effective on March 26, 2002.  As a result of the chapter 11 plan,

substantially all of RMC's assets, business and operations were transferred to Rotech, which was

incorporated in the State of Delaware on March 15, 2002, and was no longer a subsidiary of IHS.

14.    In March 2002, after Rotech was formed, and as part of RMC's financing

to pay creditors under its own chapter 11 plan, Rotech took on $575 million in secured debt

obligations.  As described below, Rotech did not realize any of the proceeds of these initial debt

issuances.  First, Rotech issued 9 ½ % senior subordinated notes due 2012 in an aggregate

---

[6] The terms of the historical capital structure are taken from the Debtors' prior credit agreements, indentures, and security agreements.

principal amount of $300,000,000 (the "9 ½ % Senior Subordinated Notes").  Rotech received

net proceeds from the sale of the notes of approximately $290 million, but the proceeds were

distributed to RMC as partial payment for substantially all the assets used in connection with its

business and operations as part of the restructuring.  Rotech did not retain any of the proceeds

from the sale of the notes for use in its businesses.

15.     Second, Rotech entered into senior secured credit facilities with UBS for

up to $275 million (the "2002 Credit Facility").  The 2002 Credit Facility consisted of:  (i) a $75

million five-year revolving credit facility; and (ii) a $200 million six-year term loan facility.  The

term loan was drawn in full on the consummation of RMC's chapter 11 plan, which occurred

contemporaneously with the sale of the 9 ½ % Senior Subordinated Notes.   Again, Rotech did

not retain any of the proceeds from the 2002 Credit Facility for use in its business.

**B.     Rotech's Efforts to Refinance its Original Indebtedness**

**(i)     The 2006 Credit Facility**

16.     Prior to the maturity of the 2002 Credit Facility, on September 15, 2006,

Rotech replaced the 2002 Credit Facility by entering into a new credit agreement with Highland

Financial Corp. (the "2006 Credit Facility").  The 2006 Credit Facility had a maximum credit

amount of $120 million that consisted of a $25 million revolving line of credit and a $95 million

term loan.

**(ii)     The 2007 Credit Facility**

17.     On March 30, 2007, Rotech replaced the 2006 Credit Facility by entering

into a new credit agreement (the "2007 Credit Facility") with the Credit Suisse Securities (USA)

LLC and several other banks and financial institutions.  Under the 2007 Credit Facility, the

lenders provided a payment-in-kind term loan in an aggregate principal amount of $180 million.

The proceeds of the 2007 Credit Facility were used to repay any amounts due under the 2006

9

Credit Facility and for general working capital purposes.  The 2007 Credit Facility was secured

by substantially all the Company's assets and was to mature on September 26, 2011.

### (iii)    The First Lien Notes

18.    On October 6, 2010, Rotech repaid all the outstanding indebtedness under

the 2007 Credit Facility by using $13.7 million of cash on hand together with the proceeds of

$230.0 million in aggregate principal amount of 10.75% Senior Secured Notes due 2015 (the

"First Lien Notes") pursuant to an indenture among Rotech, the subsidiary guarantors, and The

Bank of New York Mellon Trust Company, N.A., as trustee.  The First Lien Notes will mature

on October 15, 2015 and are secured by a first priority security interest in substantially all the

Company's assets.  The First Lien Notes are guaranteed by all Rotech's wholly owned

subsidiaries and each guarantee is full, unconditional, joint, and several.  The First Lien Notes

permitted Rotech to borrow up to an additional $25 million in principal amount on a *pari passu*

basis.

### (iv)    The Second Lien Notes

19.    On March 17, 2011, the Company repaid all the outstanding indebtedness

under the 9 ½ % Senior Subordinated Notes by using $24.5 million of cash on hand together

with the proceeds of $290 million in aggregate principal amount of Senior Second Lien Notes

(the "Second Lien Notes") pursuant to an indenture among Rotech, the subsidiary guarantors,

and The Bank of New York Mellon Trust Company, N.A., as trustee.  The Second Lien Notes

are secured by a second lien on substantially all the Company's assets.  The Second Lien Notes

are guaranteed by all Rotech's wholly owned subsidiaries and each guarantee is full,

unconditional, joint, and several.[7]  The Second Lien Notes permit Rotech to borrow up to an additional $35 million in principal amount on a *pari passu* basis with the First Lien Notes.  The Second Lien Notes currently mature on March 15, 2018.

   **(v)**  **The 2011 Credit Agreement**

   20.  Also on March 17, 2011, the Company entered into a credit agreement with Credit Suisse AG and Jefferies Finance LLC (the "2011 Credit Agreement").  The 2011 Credit Agreement provided for a revolving credit facility commitment of up to $10,000,000, which was well within the limits of indebtedness permitted under the First Lien Notes and the Second Lien Notes.  On March 7, 2012, the 2011 Credit Agreement was amended to extend the final maturity date from March 17, 2012 to March 17, 2014.  The credit facility was secured by substantially all the Company's assets.  The credit facility was fully drawn as of September 15, 2012.

   **(vi)**  **The Term Loan Facility**

   21.  On December 21, 2012, Rotech entered into a new term loan credit agreement with Silver Point Finance, LLC, as administrative agent thereunder and SPCP Group, LLC (an affiliate of Silver Point Finance, LLC), as initial lender thereunder (the "Term Loan Credit Agreement"), relating to a delayed draw term loan credit facility (the "Term Loan Facility") under which Rotech is permitted to borrow up to $25 million.  Amounts under the Term Loan Facility bear interest at Rotech's option of either (i) the LIBOR Rate (as defined in the Term Loan Credit Agreement) plus 10.0% per annum or (ii) a fluctuating rate (defined as ABR in the Term Loan Credit Agreement) plus 9.0% per annum.  Interest is payable monthly.

---

[7]  On October 24, 2011, Rotech executed four Supplemental Indentures adding two new subsidiary entities, Ellis County Home Medical Equipment, LLC and Qualicare Home Medicare, Inc., as subsidiary guarantors under the Company's First Lien Indenture, dated October 6, 2010, and the Second Lien Indenture, dated March 17, 2011.

The amount Rotech is permitted to borrow pursuant to the Term Loan Facility is the maximum amount permitted under the First Lien Notes Indenture.

22.    A portion of the proceeds from the Term Loan Facility was used to retire the commitments and loans then outstanding under the 2011 Credit Agreement.  Pursuant to the Term Loan Credit Agreement, Rotech borrowed $23.5 million of the Term Loan Facility on December 21, 2012.  The remaining $1.5 million portion of the Term Loan Facility that was not borrowed at such time (the "<u>Delayed Draw Facility</u>") may be borrowed on or before January 1, 2014 (the "<u>Delayed Draw Termination Date</u>"), so long as certain limited conditions as set forth in the Term Loan Credit Agreement are satisfied.  All borrowings under the Term Loan Facility participate in a first priority security interest in substantially all of Rotech's and the subsidiary guarantors' assets on a *pari passu* basis with Rotech's First Lien Notes. The Term Loan Credit Agreement does not require any amortization payments in respect of the loans and the entire principal amount is due at maturity.  The loans under the Term Loan Facility will mature on April 30, 2015.

**(vii)    Letters of Credit**

23.    Rotech has an outstanding letter of credit totaling $7.465 million, issued by Regions Bank for the benefit of Ace American Insurance Company and its affiliate, Pacific Employers Insurance Company (together, the "<u>LOC Beneficiaries</u>").  If Rotech does not fulfill certain obligations to the LOC Beneficiaries, the LOC Beneficiaries can draw down the letter of credit.  Rotech's letter of credit is cash collateralized at 100% of its face amount.  The cash collateral for this outstanding letter of credit was included in the restricted cash amount listed in Rotech's accompanying condensed consolidated balance sheet as of September 30, 2012.

**(viii)   Capital Leases**

24.     Rotech operates principally in leased offices and warehouse facilities.  The Company's leases are either classified as operating leases or capital leases, depending on the lease terms, for financial reporting purposes.  As of December 31, 2012, the equipment under capital leases was included in property and equipment with a carrying amount of $6.023 million and $1.356 million of accumulated depreciation.  Rotech's long-term debt included capital lease obligations of approximately $4 million as of December 31, 2012.

**(ix)   Common Stock**

25.     Rotech's common stock was traded on the NASDAQ exchange, until it was delisted in 2008.  It is currently quoted on the Over The Counter Bulletin Board.  As of March 5, 2012, there were 26,017,976 shares of Rotech's common stock issued and outstanding. As of March 5, 2012, there were approximately 73 holders of record of Rotech's common stock. This number was derived from Rotech's stockholder records and does not include beneficial owners of Rotech's common stock whose shares are held in the names of various dealers, clearing agencies, banks, brokers, and other fiduciaries.  As of March 20, 2013, Rotech's market cap was $3.67 million.  Rotech did not pay any cash dividends on its common stock for the fiscal years ended December 31, 2011, 2010, or 2009.

## Events Leading To Chapter 11

**A.      Reductions in Reimbursement Rates Severely Impact Revenue**

26.     As described above, Rotech was saddled with over $500 million of indebtedness since the moment it was spun out of IHS in 2002.  At the time, Rotech was expected to be able to service its debt with robust revenues from reimbursement by third-party payors.  However, like many healthcare sector participants, Rotech has experienced declining

revenues resulting from government imposed permanent reductions in rates of reimbursement.

Three different pieces of legislation have had a dramatic impact on Rotech's revenues:

- **The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA").** MMA implemented several changes that, *inter alia*, resulted in a reduction in reimbursement rates beginning in January 2005 for oxygen equipment and certain other DME items (including wheelchairs, nebulizers, hospital beds, and air mattresses). The change resulted from the percentage difference between the amount of payment otherwise determined for 2002 and the 2002 median reimbursement amount under the Federal Employee Health Benefits Program as determined by the Office of the Inspector General of the Department of Health and Human Services. The MMA also revised the payment methodology for certain drugs, including inhalation drugs dispensed through nebulizers. The MMA established new payment limits and procedures for drugs reimbursed under Medicare Part B. Beginning in 2005, inhalation drugs furnished to Medicare beneficiaries are reimbursed at 106% of the volume-weighted average selling price ("ASP") of the drug, as determined from data provided each quarter by drug manufacturers under a specific formula described in the MMA. Implementation of the ASP-based reimbursement formula resulted in a significant reduction in payment rates for inhalation drugs.

- **The Deficit Reduction Act of 2005 ("DRA").** The DRA was signed into law on February 8, 2006, and made certain changes to the way Medicare Part B pays for certain of Rotech's HME products, including oxygen and oxygen equipment. For oxygen equipment, prior to the DRA, Medicare made monthly rental payments indefinitely, provided medical need continued. The DRA capped the Medicare rental period for oxygen equipment at 36 months of continuous use, after which time, ownership of the equipment would transfer to the beneficiary. For purposes of this cap, the DRA provided for a new 36-month rental period that began January 1, 2006 for all oxygen equipment. On November 1, 2006, the Centers for Medicare & Medicaid Services ("CMS") released a final rule to implement the DRA changes, which went into effect January 1, 2007. Under the rule, CMS clarified the DRA's 36-month rental cap on oxygen equipment. CMS also revised categories and payment amounts for the oxygen equipment and contents during the rental period and for oxygen contents after equipment ownership by the beneficiary.

- **Medicare Improvement for Patients and Providers Act of 2008 ("MIPPA").** MIPPA was passed on July 15, 2008, and repealed the transfer of title to oxygen equipment at the end of the 36-month rental cap, although the rental cap remained in place. Effective January 1, 2009, after the 36th continuous month during which payment is made for the oxygen equipment, the equipment is to continue to be furnished during any period of medical need for the remainder of the reasonable useful lifetime of the equipment.

27.     Since 2005, these permanent reductions in reimbursement rates have had a profound impact on the Company and resulted in over $1.2 billion in aggregate losses.  As described in the table below, the annual reductions in reimbursements are permanent and cause a cumulative effect each year.

| Year | Permanent Reimbursement Reduction | Cumulative Reduction Impact |
|------|-----------------------------------|-----------------------------|
| 2005 | $56.3 million | $56.3 million |
| 2006 | $59.5 million | $115.8 million |
| 2007 | $0 | $115.8 million |
| 2008 | $22.4 million | $138.2 million |
| 2009 | $70.1 million | $208.3 million |
| 2009 | $1.9 million | $210.2 million |
| 2011 | $5.1 million | $215.3 million |
| 2012 | $12 million (estimated) | $227.3 million |
| *TOTAL* | | *$1,287.2 million* |

## B.     Rotech's Cost Saving Measures

28.     In the face of losses resulting from reimbursement rate reductions, the Company worked aggressively to manage costs and improve collections.  More specifically, during 2008, Rotech completed a series of operational restructuring initiatives, which included the restructuring of its field operations, clinical programs, and pharmacy operations, as well as staffing reductions.

29.     These reductions, in addition to other cost saving initiatives, decreased the Company's annual selling, general, and administrative expenses and operating costs by approximately $52.9 million beginning in 2009.  During 2010, Rotech implemented several new initiatives intended to streamline its workflows and further leverage new internally developed systems and system enhancements. These reductions, in addition to other cost saving initiatives from 2009 to 2012, decreased Rotech's annual selling, general and administrative expenses and operating costs as a percentage of net revenue to 54.1% for the year ended December 31, 2011 compared to 58.5% for the year ended December 31, 2008.

30.     Nonetheless, since 2007, while the Company has averaged $500 million in annual net revenues, it has experienced net losses after interest costs in each of those years.

## C.     Rotech's Liquidity Crunch

31.     Since 2010 and through mid-2012, by adeptly managing costs, the Debtors mitigated the losses resulting from the reimbursement cuts, avoiding the need to seek additional credit availability that would take it to the permissible limits under the First and Second Lien Notes.  However, in the third and fourth quarters of 2012, as a result of, *inter alia*, further reimbursement reductions and a voluntary return of Medicare overpayments (as described in further detail below), the Debtors' cash needs required first, a full draw of the $10 million available under the 2011 Credit Agreement and subsequently, an additional $15 million of availability, which was realized through the Term Loan Facility.

32.     Rotech's 2012 year end net revenues were worse than expected, which put further stress on its cash position.  For 2012, net revenue declined from $482.0 million to $462.3 million and Adjusted EBITDA decreased from $105.6 million to $86.3 million in 2011 and 2012, respectively.   As a result, cash from operations was reduced to $25.7 million and, in the face of persistent capital expenditure requirements, the Company's liquidity was reduced dramatically.  In 2012, the Company expended approximately $14.6 million of cash from its balance sheet and further utilized an incremental $11.2 million of liquidity under the Term Loan Facility.

## D.     Competitive Bidding Results

33.     On January 30, 2013, CMS, the agency responsible for administering the Medicare program, issued the results for "Round 2" of its competitive bidding process to supply beneficiaries with oxygen, CPAP devices, DME, prosthetics, orthotics, and supplies – a process

which was intended to result in a financial savings to both the Medicare Part B Trust Fund and

its beneficiaries.  According to CMS's website:

> suppliers compete to become Medicare contract suppliers by submitting
> bids to furnish certain items in competitive bidding areas, and [CMS]
> awards contracts to enough suppliers to meet beneficiary demand for the
> bid items. The new, lower payment amounts resulting from the
> competition replace the Medicare [DME] fee schedule amounts for the bid
> items in these areas . . . .  The program sets more appropriate payment
> amounts for [DME] items while ensuring continued access to quality items
> and services, which will result in reduced beneficiary out-of-pocket
> expenses and savings to taxpayers and the Medicare program.

*See www.cms.gov/Medicare/Medicare-Fee-for-*
*Payment/DMEPOSCompetitiveBID/Index.html?redirect=/DMEPOSCometitiveBid/*

34.    Rotech competes with many other companies for the right to provide items

to beneficiaries in defined geographic regions.  CMS selects contract suppliers that agree to

receive as payment the "single payment amount" calculated by CMS after bids are submitted.

As stated above, CMS announced the results for Round 2 competitive bidding on January 30,

2013.  The overall average reduction in rates in Round 2 competitive bidding was 45%.  Rotech

won 88 competitive bidding areas ("CBAs") and lost 12 CBAs for oxygen supplies &

equipment.  Rotech won 14 CBAs and lost 86 CBAs for CPAP related supplies & accessories.

Rotech won 129 CBAs and lost 371 CBAs for the remaining industry segments.  Consequently,

the overall impact of Round 2 competitive bidding on the Company, which will go into effect on

July 1, 2013, will be a recurring decrease in annual net revenue of approximately $28 million.[8]

**E.    Rotech's Prepetition Restructuring Efforts**

35.    In the face of the severe financial and operational challenges described

above and in combination with its existing annual debt service obligations of approximately $50

million under the First Lien Notes and Second Lien Notes, the Debtors made a concerted effort

---

[8] This amount was estimated after considering the runoff of revenue for all grandfathered patients (associated with
lost CBA markets) and without any projection of volume increases in CBA markets won.

to consider all of their strategic alternatives. In the fourth quarter of 2012, the Debtors retained

Barclays Capital, Inc. ("Barclays") to analyze and determine whether an out-of-court

restructuring of the Debtors' balance sheet would be feasible. At that time, Barclays considered

various options to improve the Debtors' liquidity and debt positions, including refinancing

and/or equitizing certain debt obligations. Barclays' efforts revealed a general market

unwillingness to provide the Debtors with additional financing or to increase the Debtors'

borrowing base. The lack of market interest in an out-of-court restructuring, coupled with the

Debtors' increasing needs to service their long-term debt obligations in the face of declining

revenue and operational challenges, convinced the Debtors in the first quarter of 2013 that an

out-of-court restructuring was becoming increasingly unlikely.

36.    Accordingly, after considering all available options, the Debtors

determined that commencement of cases under chapter 11 would be in their best interests, as

well as those of their creditors and other parties in interest. Thereafter, the Debtors entered into

discussions with various stakeholders to effectuate a meaningful restructuring under bankruptcy

court supervision if an out-of-court solution would not be attainable.

**F.    Agreement with Consenting Noteholders**

37.    A special committee of the Rotech board of directors, consisting of

directors who do not own Second Lien Notes, authorized Rotech to announce on March 15, 2013

that certain parties holding, in the aggregate, a majority in outstanding principal amount of both

Rotech's First and Second Lien Notes (collectively, the "Consenting Noteholders") reached an

agreement (the "Plan Support Agreement") with the Company to restructure and recapitalize the

Company to eliminate substantial secured legacy debt. One of the Consenting Noteholders is

also the lender under the Term Loan Facility. Pursuant to the Plan Support Agreement, the

Company agreed to reorganize its capital structure through a pre-arranged chapter 11 plan (the "Plan").

38.     Subject to the terms and conditions of the Plan, the Company anticipates that (i) holders of the Term Loan Facility and the First Lien Notes will receive their pro rata share of an amended and restated term loan to be secured by a first priority security interest in substantially all of the reorganized Company's assets; (ii) the Second Lien Notes will be converted into 100% of the common equity of the reorganized Company, subject to dilution by the equity interests issued under the Management Equity Incentive Program (thereby eliminating in excess of $300 million of secured debt); (iii) all the Company's outstanding shares will receive a distribution of 10 cents per share (provided that the total amount paid on account of such interests does not exceed $2.62 million); provided, however, that if a senior class rejects the plan, the shareholders may receive less or nothing at all and (iv) trade creditors and vendors who agree to maintain or reinstate payment terms as existing prior to the Commencement Date will be paid in full upon the effective date of the Plan.  Other unsecured claims will be paid in full if the aggregate amount of unsecured claims does not exceed $2,500,000 and except as otherwise set forth in the Plan.

39.     On the Commencement Date, the Debtors commenced these chapter 11 cases to successfully reorganize their businesses and to save 4,000 jobs, and contemporaneously filed the proposed chapter 11 plan contemplated by the Plan Support Agreement.

### Support for Relief Requested in the First Day Pleadings[9]

40.     Concurrently with the filing of their chapter 11 petitions, or as soon as practicable thereafter, the Debtors have filed (or will file) several pleadings and applications (the

---

[9] Capitalized terms not defined hereafter shall have the same meanings ascribed to such terms in the respective First Day Pleadings.

"First Day Pleadings") and a number of accompanying proposed orders (the "First Day Orders"),
pursuant to which the Debtors request relief they believe is critical to enable them to preserve
their going concern value for creditors.

41.    I have reviewed each of the First Day Pleadings referenced below.  The
First Day Pleadings were prepared with my input and assistance, or the input and assistance of
employees working under my supervision.  I believe the information contained in the First Day
Pleadings is accurate and correct.  A brief description of the relief requested and the facts
supporting each of the First Day Pleadings and First Day Orders is set forth below.  As set forth
more fully below, I believe that the relief requested in these motions and applications is critical
to the Debtors' ability to preserve the value of their estates and facilitate their reorganization
efforts.

**(i)      Debtors' Motion for an Order Pursuant to Bankruptcy Rule 1015(b) and
Local Rule 1015-1, Directing Joint Administration of Chapter 11 Cases**

42.    As an initial matter, the Debtors are requesting joint administration of their
cases for procedural purposes only.  Joint administration avoids the preparation, service, and
filing of duplicative notices, pleadings, and orders in each Debtor's case.  This will save
considerable expense, time and resources, and facilitate the ability of parties in interest to
monitor these chapter 11 cases.

43.    I believe joint administration of the Debtors' chapter 11 cases is in the best
interests of the Court and its clerk's office, the Debtors, their estates, and all parties in interest.

**(ii)** **Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Debtors to (A) Obtain Post-Petition Financing, and (B) Grant Senior Liens, Junior Liens and Superpriority Administrative Expense Status, (II) Approving Use of Cash Collateral, (III) Granting Adequate Protection to Certain Prepetition Secured Parties, (IV) Scheduling a Final Hearing and Establishing Related Notice Requirements, and (V) Granting Related Relief**

44.     The Debtors intend to finance their post-petition operations through a $30 million new money, senior secured, superpriority DIP Facility to be provided by Silver Point Finance LLC ("Silver Point"), as agent, and Silver Point (or affiliates) and Capital Research Management Company (or affiliates) as initial lenders (the "DIP Lenders").[10]   The Debtors request authority (a) to obtain post-petition financing pursuant to the DIP Facility, the salient terms of which are detailed in the referenced motion (the "Financing Motion"), (b) to use Cash Collateral in which the Pre-Petition Secured Parties assert an interest in conjunction with the DIP Facility, and (c) to grant adequate protection to the Pre-Petition Secured Parties for the priming of their liens in the Prepetition Collateral and the Debtors' use of Cash Collateral.

45.     The Debtors have an immediate need for post-petition financing to support their working capital requirements, make payments to vendors, employees and other third parties, and to pay other administrative expenses.  Such financing is critical to preserve the going concern value of the Debtors' estates, and to achieve confirmation of the pre-arranged Plan.

46.     Because virtually all of the Debtors' assets are encumbered by the liens of the Pre-Petition Secured Parties, the Debtors have no unencumbered funds with which to pay ongoing wages, salaries and other operating expenses, including, but not limited to, rent and utility obligations.  Due to the nature and magnitude of the Debtors' operations, which are

---

[10] The Debtors are advised that Silver Point, as arranger, will offer all First Lien Holders and Senior Noteholders (the aggregate claims of such holders, collectively, the "Senior Claims") the opportunity to participate in the DIP Facility on a *pro rata* basis based on the aggregate principal amount of each holder's respective Senior Claims outstanding as of a specified date.

dependent upon uninterrupted access to necessary working capital, immediate access to the DIP

Facility is essential to prevent irreparable harm to the Debtors' estates.  The DIP Facility is also

necessary to provide assurance to employees, landlords, suppliers and other parties that they will

be paid on a timely basis for post-petition services, and to assure patients that they will have

uninterrupted access to the Debtors' products and related services.  Without immediate access to

the DIP Facility, the Debtors' day-to-day operations would come to a halt, jeopardizing the

Debtors' reorganization from the outset.

   47. The Debtors submit that, other than the DIP Facility, there are no viable

financing alternatives available to them under the circumstances.  In that regard, I am aware that,

prior to the Commencement Date, Barclays (the Debtors' financial advisor) explored available

DIP financing options.  Such efforts were complicated by several factors, including, among

others, the Debtors' debt structure (which includes several tranches of secured debt), the value of

the Debtors' businesses and assets, the unavailability of unencumbered assets, the Debtors'

immediate need for liquidity under a DIP facility, and the devastating adverse impact any delay

in obtaining DIP financing would have on the going concern value of the Debtors' estates.

   48. Initially, Barclays requested a DIP financing proposal from the largest

(and controlling) holders of First and Second Lien Notes and the lender under the first lien Term

Loan Facility, each of whom was intimately involved in the pre-petition restructuring

negotiations that led to the Plan Support Agreement.  During discussions with these secured debt

holders, it became clear that they would not consent to any DIP facility offered by a third-party

lender that required the priming of their pre-petition liens.  Based on discussions with the

Debtors' professional advisors, I understand that, even if a competitive priming DIP facility were

offered to the Debtors, obtaining approval for such financing would result in difficult, complex,

and protracted litigation with the Pre-Petition Secured Parties, the results and timing of which could not be predicted with certainty.  I believe that any uncertainty or funding delay resulting from protracted DIP financing litigation would be extremely damaging to the Debtors' ability to operate as a going concern, immediately jeopardizing these chapter 11 cases at the outset and resulting in irreparable harm to all stakeholders.  Equally as important, absent a consensual DIP financing facility, the Debtors would lose the support of the Consenting Noteholders for the Plan under the Plan Support Agreement.

49.    Given these circumstances, Barclays contacted three sophisticated lending sources that are well-known in the DIP loan arena to gauge market interest in providing DIP financing to the Debtors on an unsecured basis and/or secured by junior liens on the Debtors' fully encumbered assets.  I am advised that after discussing with Barclays the size and scope of the required financing, the amount of pre-petition secured debt that would be senior to such a junior DIP loan, the Debtors' financial status and the nature and extent of the Debtors' business operations, none of the lenders contacted were willing to make a DIP financing proposal and further efforts on that front would not have yielded different results.

50.    As a result, the Debtors focused their efforts on negotiating the DIP Facility proposed by the DIP Lenders.  In the weeks prior to the Commencement Date, the Debtors and the DIP Lenders exchanged several iterations of term sheets for the DIP Facility. Initial drafts of the DIP credit agreement were developed in the days leading up to the Commencement Date, and the Debtors and the DIP Lenders continued to negotiate and finalize such documents up until the Commencement Date.  Thus, the terms and conditions of the DIP Facility were the product of extensive good faith, arm's length negotiations among the Debtors, the DIP Agent, the DIP Lenders and their respective professional advisors.

23

51.     Terms that were initially proposed by the DIP Lenders were negotiated by Barclays and the Debtors' other professional advisors and a number of the proposed terms were modified for the benefit of the Debtors, including, without limitation, eliminating a proposed "roll-up" of pre-petition loans, modifying the proposed interest rate, modifying proposed milestones, and modifying other economic and legal provisions.

52.     Moreover, based on consultation with the Debtors' professional advisors, I believe that the terms and conditions of the DIP Facility are fair, reasonable and appropriate, and reflect extensive compromise on both sides.  I believe that, through the DIP Facility, the Debtors achieved the best possible outcome for their financing needs under the circumstances. Accordingly, and based on my discussions with the Debtors' professional advisors, I believe that the DIP Facility is the best and only viable financing option available to Debtors under the circumstances.  I further believe that the DIP Facility provides the Debtors with access to additional liquidity that is critical to maintaining the going concern value of these estates while the Debtors pursue an expeditious reorganization pursuant to their pre-arranged Plan.

53.     In connection with the DIP Facility, the Debtors propose to provide adequate protection to the Pre-Petition Secured Parties in the manner specified in the Financing Motion and the Interim Order.  As more fully described in the Financing Motion and the Interim Order, such adequate protection measures include the following:  (i) maintenance of the pre-petition liens of the Pre-Petition Secured Parties; (ii) the granting of replacement liens and allowed claims under section 507(b) of the Bankruptcy Code to the Pre-Petition Secured Parties, in each case to the extent and with the priorities specified in the Financing Motion; (iii) the payment, in the ordinary course, of an approximately $12 million semi-annual interest payment due in respect of the First Lien Notes; (iv) the payment as and when due of interest due in respect

of the Term Loan Facility; and (v) the payment of specified fees and expenses of the Pre-Petition

Secured Parties and other parties.   Such measures were negotiated in good faith and at arm's

length among the Debtors, the DIP Agent, the DIP Lenders, and the requisite Pre-Petition

Secured Parties.  I am advised that the Pre-Petition Secured Parties support and consent (or are

deemed to have consented) to the DIP Facility and the form of adequate protection to be

provided to them as specified in the Financing Motion and the Interim Order.

54.     Overall, I believe that entering into the DIP Facility is a sound exercise of

the Debtors' business judgment, and that approval of the DIP Facility and the other relief

requested in the Financing Motion is in the best interests of the Debtors' estates.

**(iii)     Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 345, 363, 364, and 503(b) and Bankruptcy Rules 6003 and 6004, for Order (I) Authorizing Debtors to Continue Using their Cash Management System and Maintain Existing Bank Accounts and Business Forms, (II) Authorizing Debtors to Pay Outstanding Pcard Program Balance, (III) Waiving Compliance with the Deposit and Investment Requirements of Bankruptcy Code section 345(b), and (IV) Prohibiting Banks from Offsetting any Funds of Debtors**

55.     To manage their businesses and operations efficiently, the Debtors utilize

a largely centralized cash management system (the "Cash Management System") to collect and

transfer funds from numerous sources and accounts, and disburse funds to satisfy obligations

arising from the daily operation of their businesses.  To facilitate the Debtors' transition into

chapter 11 and the uninterrupted operation of their Cash Management System, the Debtors

request authority to (i) continue using their Cash Management System and maintain the existing

bank accounts and business forms currently in use, (ii) pay the outstanding balance under the

Pcard Program, (iii) forgo compliance with the restrictive deposit and investment requirements

outlined in the Office of the United States Trustee (the "U.S. Trustee") guidelines, and

(iv) prohibit Banks from offsetting, freezing, affecting, or otherwise impeding the use of, transfer of, or access to, any funds of the Debtors.

56.    In the ordinary course of business, the Debtors use the Cash Management System, which is similar to those utilized by other large companies, to streamline collection, transfer, and disbursement of funds generated by the Debtors' business operations.  The Cash Management System is operated and maintained by Rotech, the Debtors' primary operating entity.  All receivables are received by, and all payables are paid by, Rotech on behalf of each of the Debtors in the ordinary course of business.  The Debtors track the billings, collections, transfers, and disbursements made on behalf of the Debtors in the ordinary course of business. As such, the Debtors have the ability to determine at any given moment the amount of cash held by Rotech that is attributable to each of the Rotech subsidiaries, and the prepetition and postpetition amounts owed by each entity to each Debtor.

57.    The Cash Management System has three main components:  (a) cash collection, including the collection of payments made to the Debtors by payors; (b) cash concentration; and (c) cash disbursements to fund the Debtors' operations.  In addition to the bank accounts utilized in these three processes, there are two independent bank accounts that the Debtors use to operate their business.

### A.    Cash Collection

58.    All checks, cash, and electronic fund transfers received by the Debtors are currently deposited each day into one of eight bank accounts.  These eight bank accounts correspond to the Debtors' eight different billing centers (the "Billing Center Accounts").  The Billing Center Accounts are operated independently by the respective billing center.  When Rotech receives cash from a payor, it is deposited into a Billing Center Account based on the geographic location of the payor.  Further, each Billing Center Account is a zero balance account

("ZBA"), meaning that money is swept into a central account at the close of each day, as further explained below.

**B.      Cash Concentration**

59.      At the end of every business day, the funds in each of the Billing Center Accounts are "swept" into the Debtors' central depository account (the "Corporate Account"). By sweeping the funds in the Billing Center Accounts into the Corporate Account at the end of each business day, the Debtors are easily able to monitor their overall cash position.  Further, utilizing the Billing Center Accounts (as opposed to having funds deposited directly into the Corporate Account) allows the Debtors to better monitor the cash generation of each individual billing center.

**C.      Cash Disbursements**

60.      Upon Rotech's request, cash is transferred from the Corporate Account to fund operations and payroll obligations of the applicable Debtor through ZBA disbursement accounts.  The Debtors currently maintain two U.S. dollar disbursement accounts—one for the purpose of funding the Debtors' payroll obligations and one for the purpose of funding the Debtors' general operations.

**D.      Independent Accounts**

61.      Rotech also has two independent, non-ZBA bank accounts to facilitate the operation of its business.  Both of these accounts operate as collateral to secure certain of the Debtors' obligations.  First, Rotech holds approximately $7,500,000 in a certificate of deposit account to collateralize an outstanding letter of credit issued by Regions Bank.

62.      Second, Rotech holds approximately $300,000 in a money market account to collateralize the Debtors' obligations under the Pcard Program (the "Money Market for Pcard Programs Account").  The Pcard Program offers 13 restricted, rule-based credit cards (aka

Pcards) through Regions Bank to 12 executives of Rotech.  There are three additional, non-executive Pcards—the Pcards labeled "Rotech Healthcare-Pava" (which was not in use last year), "Rotech Healthcare 2," and "Rotech Healthcare, Inc.," each of which is used for general corporate purposes.  There is an aggregate credit limit of $300,000 for all the Pcards—the executive Pcards have a collective credit limit of $50,000, and the non-executive Pcards have a collective credit limit of $250,000.  To secure the Debtors' obligations under the Pcard Program, there must be approximately $300,000 deposited in the Money Market for Pcard Programs Account.

### E.    Outstanding Pcard Balance

63.    To the extent the Debtors have an outstanding balance owed to Regions Bank under the Pcard Program as of the Commencement Date (the "Outstanding Pcard Balance"), the Debtors request authority to pay this amount.  Should the Debtors not pay the Outstanding Pcard Balance, there is no guarantee Regions would continue to honor the Pcard Program going forward.  Such a disruption would greatly inconvenience the Debtors' employees' ability to pay for certain products and services that are critical to the Debtors' business.  Further, the Outstanding Pcard Balance does not exceed and is secured by the amount of cash in the Money Market for Pcard Programs Account (which was fully funded as of the Commencement Date), so its payment does not prejudice the Debtors' unsecured claimholders.  As such, ample justification exists to authorize the Debtors' to pay the Outstanding Pcard Balance.

### F.    Existing Bank Accounts and Business Forms

64.    If the Debtors were required to close the bank accounts comprising the Cash Management System (the "Bank Accounts") and open new accounts, it would be unduly burdensome and disruptive.  The transition to chapter 11 will be more efficient and orderly if the

Debtors have the discretion to continue use of the Bank Accounts following the Commencement Date with the same account numbers, and to pay any bank fees that may be incurred in connection with the Bank Accounts or any other new account that may be opened in the ordinary course of business.

65.     Additionally, to minimize administrative expense and delay, the Debtors request authority to continue to use their checks and their existing business correspondence and forms, including letterheads, wire transfer instructions, and other business forms (collectively, the "Business Forms") substantially in the form existing before the Commencement Date, without reference to the Debtors' status as debtors in possession.  If the Debtors need to purchase new check stock or additional other Business Forms during the pendency of these chapter 11 cases, such check stock and/or other Business Forms will include a legend referring to the Debtors as "Debtors in Possession" or "DIP."  Any business parties doing business with the Debtors undoubtedly will be aware, as a result of the size of these cases and the nature of the industry, of the Debtors' status as debtors in possession.

### G.    Intercompany Cash Flows

66.     Rotech collects receipts and makes disbursements on behalf of all the Debtors, and thus distributions and receipts may reflect cash balances due and owing from one Debtor to another Debtor.  These balances represent extensions of intercompany credit made in the ordinary course of business.

67.     To ensure that each individual Debtor will not, at the expense of their creditors, fund the operations of an affiliated entity, the Debtors respectfully request that the Court authorize the Debtors to treat all such obligations (the "Intercompany Claims") arising after the Commencement Date in the ordinary course of business as administrative expenses.  If the court authorizes the Debtors to treat the Intercompany Claims as administrative expenses,

then each entity utilizing funds flowing through the Cash Management System and receiving services through the intercompany arrangements should continue to bear ultimate repayment responsibility for such ordinary course transactions and their related share of the cost of services provided.

**H.     Waiver of Section 345 Requirements**

68.     In connection with this Declaration, I was provided with a copy of, and have reviewed, the U.S. Trustee's deposit and investment guidelines.  We are requesting a 60-day initial waiver to evaluate our ability to comply with the deposit and investment guidelines. If there are any accounts that do not meet the guidelines, the Debtors are requesting the preservation of their ability to seek a further interim waiver or a final waiver of this requirement.

**I.     Prepetition Claims of the Bank**

69.     The Debtors further request that, except as provided in any order of this Court, the Bank providing and maintaining the Bank Accounts be prohibited from offsetting, freezing, affecting, or otherwise impeding the use of, transfer of, or access to, any funds of the Debtors deposited in the Bank Accounts before or after the Commencement Date on account, or by reason, of any prepetition claim of such Bank against the Debtors.

70.     I submit that the Cash Management System is an ordinary course, essential business practice that provides significant benefits to the Debtors' corporate group.  In my opinion, any disruption of the Cash Management System at this critical juncture would irreversibly and irreparably harm the Debtors' business operations, and the value thereof. Therefore, I believe the maintenance of the existing Cash Management System, as well as the various related relief requested in the Cash Management Motion, is in the best interests of the Debtors' estates and all parties in interest.

**(iv)   Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363(b), 363(c), 507(a)(4), and 507(a)(5) and Bankruptcy Rules 6003 and 6004 for Order (I) Authorizing Payment of Prepetition Employee Obligations and Continuation of Prepetition Employee Benefits, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief**

71.     The Debtors are requesting authority to pay, in their discretion, any and all obligations and costs incurred in respect of or related to employee obligations, including prepetition Basic Pay Obligations, Third-Party Sourced Personnel Costs, Bonus and Commission Obligations, Payroll Taxes, Payroll Service Fees, Expense Reimbursements, and other Employee Benefit Obligations (each as defined in the motion and collectively, the "Employee Obligations"), and to maintain and continue their prepetition employee-related practices, programs, and policies comprising such Employee Obligations, as may be modified, amended, or supplemented from time to time in the ordinary course.  Additionally, to facilitate the required payments and maintenance of these programs, the Debtors are requesting the Court to authorize applicable banks and other financial institutions to receive, honor, process, and pay any and all checks and electronic transfers drawn on the Debtors' accounts, to the extent that such checks or transfers relate to any Employee Obligation (except for any payments to insiders).

72.     In the ordinary course of their businesses, the Debtors incur payroll and various other obligations, such as expense reimbursements, and provide healthcare coverage, incentive programs, and other benefit plans to approximately 4,000 employees in exchange for the performance of services.  The Debtors estimate that the aggregate amount of the prepetition Employee Obligations accrued and unpaid as of the Commencement Date, including all costs incident to such obligations, does not exceed approximately $8.5 million.

73.     A detailed chart reflecting the Debtors' wage, employee benefits and related obligations is attached to this Declaration as Exhibit A.

31

74.    To the extent there are prepetition amounts outstanding as of the

Commencement Date for Basic Pay Obligations, the Debtors believe these are priority claims

that must be paid in full before any general unsecured obligations of the Debtors may be

satisfied.  Further, for amounts exceeding the priority claim limit of $12,475 (other than

Severance Obligations), and for Employee Obligations not otherwise entitled to priority, the

Debtors request authority to pay such prepetition amounts due to the employees, because such

payments are essential to the Debtors' operations and the benefits achieved by such payments far

exceed the negative effects resulting from failure to make such payments.  The Debtors do not

believe that any wage or benefit payments subject to the statutory priority cap of Bankruptcy

Code sections 507(a)(4) and 507(a)(5) will be made in excess of $12,475 per employee.

75.    In this case, the Debtors believe any delay in payment or failure to

continue to honor the programs and policies comprising the Employee Obligations would cost

the Debtors' estates more than the requested payments due to factors such as the cost of losing an

employee's knowhow and the cost of replacement of some employees who would be inclined to

accept other jobs.  Failure to make these payments is likely to impair irreparably the employees'

morale, dedication, confidence, and cooperation, and would adversely impact the Debtors'

relationship with its employees at a time when the employees' support is critical to the Debtors'

chapter 11 cases and ongoing business operations.  Further, absent the relief requested, the

employees may suffer undue hardship and, in many instances, serious financial difficulties, as

many employees rely on their wages and benefits to meet their personal financial obligations.

76.    In addition, it would be inequitable to require the Debtors' employees to

bear personally the cost of any business expenses they incurred prepetition for the benefit of the

Debtors.  I submit that payment of all Employee Obligations in accordance with the Debtors'

prepetition business practices is in the best interests of the Debtors' estates and their creditors and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption.

77. As more fully set forth in the motion, prior to the Commencement Date, the Debtors implemented the 2013 Corporate Incentive Performance Plan. The Debtors do not seek at this time to make any payments on account of the 2013 Corporate Incentive Performance Plan. Should any of the requisite quarterly targets be achieved, which may warrant postpetition distributions under the 2013 Corporate Incentive Performance Plan, the Debtors reserve the right to seek the Court's authorization to make payments at such later time.

**(v)  Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 503(b), 361, 362(d), 363(b),363(e), 365, and 105(a) (I) Authorizing Continuation of Insurance Programs and Payment of Prepetition Insurance Obligations, (II) Authorizing Banks and Financial Institutions to Honor and Process Related Checks and Transfers, (III) Authorizing Debtors' Entry into Certain New Insurance Agreements and Assumption of Certain Prepetition Insurance Policies and Agreements, (IV) Authorizing Debtors' Continued Performance under Certain Premium Financing Agreements, and (V) Granting Related Relief**

78. The Debtors are requesting authority to (i) continue their insurance programs, described below and in the motion, (ii) pay any prepetition insurance obligations, (iii) renew any insurance policies or enter into new insurance arrangements as may be required as the annual terms of existing arrangements expire, in the ordinary course of business, (iv) enter into and perform under a recent agreement with ACE American Insurance Company ("ACE") providing workers' compensation and automobile liability coverage, and assume other prepetition insurance agreements with ACE, and (v) continue performance pursuant to its premium financing agreement with IPFS Corporation. The Debtors are also asking the Court to authorize applicable banks to process, honor, and pay all related checks and electronic fund transfers.

79.     Attached to this Declaration as <u>Exhibit B</u> is a chart setting forth the Debtors' various insurance policies, premiums (the "<u>Insurance Program Premiums</u>,") and attendant taxes, surcharges, and fees (collectively the "<u>Fees</u>," and together with the Insurance Program Premiums, the "<u>Insurance Expenses</u>") and relevant policy expiration dates.

80.     In the ordinary course of business, the Debtors maintain several insurance policies to protect against adverse occurrences (each, an "<u>Insurance Policy</u>," and together with the Workers' Compensation Program, and the Surety Bonds (each as defined below), the "<u>Insurance Programs</u>").  Through the individual Insurance Policies, the Insurance Programs provide coverage for a variety of potential liabilities and casualties, including but not limited to: workers' compensation, employers' liability, general and professional liability, automobile liability, casualty umbrella liability, employment practices, employed lawyers, fiduciary liability, director and officer liability, commercial crime, special crime, and property.

81.     The Debtors finance the premiums on their property, general and professional liability, umbrella liability, and excess liability policies (collectively, the "<u>PFA Policies</u>") under a premium financing agreement with IPFS Corporation ("<u>IPFS</u>"), dated as of March 19, 2013 (the "<u>Financing Agreement</u>"), which carries an annual interest rate of 4.950%. IPFS pays the premiums due under the PFA Policies and the Debtors are obligated under the Financing Agreement to pay IPFS a down payment of approximately $362,000 (paid in full on March 20, 2013), plus seven monthly installments totaling approximately $98,000 (the "<u>PFA Premiums</u>").

82.     The Debtors employ Aon Risk Services Northeast, Inc. ("<u>Aon</u>"), as their broker to assist with the procurement and negotiation of the Insurance Programs.  Generally, Aon charges standard industry commission rates for each policy, which are included in the Debtors'

policy premiums, and paid as a lump sum or as otherwise required by Aon with respect to a particular Insurance Program (the "Commissions").  The Insurance Programs, with the exception of the Surety Bonds (as defined below) are typically obtained by means of an annual competitive bid process timed to end during the last week of March, which marks the beginning of the Debtors' policy year.  Aon and the Debtors recently completed the competitive bidding and renewal process, securing the bulk of the Company's Insurance Programs for the 2013–2014 policy year.

83.     The Debtors regularly post and maintain surety bonds (the "Surety Bonds") as collateral to secure certain of their obligations pursuant to state and federal law, including compliance with the requirements established for:  (a) DME suppliers to Medicare beneficiaries under federal laws and regulations; (b) DME suppliers to Medicaid beneficiaries within the state of Florida, in compliance with Florida law; and (c) wholesale distribution of prescription-only drugs in the states of Arizona, Maryland, and Wisconsin under the laws of those states.

84.     Westchester Fire Insurance Company ("Westchester") is the surety for each of the Debtors' Surety Bonds.  The relationship between the Debtors and Westchester is governed by an Indemnity Agreement dated September 9, 2009 (the "Indemnity Agreement").  Among other things, the Indemnity Agreement does not impose any collateral requirements upon the Debtors in connection with the provision of the Surety Bonds.  At present, all of the Surety Bonds are unsecured.  The Indemnity Agreement provides, however, that Westchester may demand the posting of collateral to secure the outstanding Surety Bonds and any subsequent or replacement Surety Bonds.

85.     The Debtors pay the premiums under each of the Surety Bonds (the "Surety Bond Premiums") in advance, which Surety Bond Premiums total in the aggregate approximately $215,445.00 per year.  Therefore, as of the Commencement Date, the Debtors believe no amounts will be due to Westchester in respect of the Surety Bond Premiums.  The Surety Bonds are due to automatically renew by their own terms on various dates in July, October, and November of 2013.  The Debtors anticipate they will emerge from chapter 11 prior to July 2013; however, out of an abundance of caution, the Debtors are also requesting authority to renew coverage under the Surety Bonds, pay Surety Bond Premiums in the ordinary course, and comply with the Indemnity Agreement, as necessary, without further application to or order from this Court.

86.     The Debtors are required under the laws of the various states in which they operate to maintain workers' compensation insurance that provides their employees with coverage for injuries arising from or related to their employment with the Debtors.  In connection therewith, the Debtors have purchased certain workers' compensation policies from ACE (collectively, and together with any agreements related thereto, the "Workers' Compensation Program").

87.     Under the Workers' Compensation Program, ACE provides insurance coverage for workers' compensation claims in amounts required under applicable law, subject to a $250,000 deductible per occurrence.  As collateral, among other things, ACE requires the Debtors to post an "evergreen" irrevocable letter of credit and pay into a paid loss deposit fund (collectively, the "ACE Collateral").  Prior to the Commencement Date, the Debtors negotiated with ACE for continuing coverage under the Workers' Compensation Program, along with other coverage, which was set to expire at the end of March 2013.  The Debtors determined that, due

to the anticipated duration of their chapter 11 cases, and the greater financial stability they anticipate achieving through the Plan Support Agreement, renewal of policy coverage under the Workers' Compensation Program for three months, with the option to obtain additional coverage as necessary, was preferable to the other alternatives.  The Debtors are asking the Court to approve their entry into the agreement with ACE and specific terms as required conditions subsequent thereto, including a requirement that the Debtors assume certain agreements.

88.     I believe that granting the authority to pay expenses relating to the Insurance Programs in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  I also believe that the assumption of the agreements in fulfillment of the Debtors' obligations to ACE represents a sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their creditors, and all parties in interest, and should, in all respects be approved.  The nature of the Debtors' businesses makes maintaining the Insurance Programs on an uninterrupted basis essential.  The nonpayment of any Insurance Expense, or lapse in coverage, could result in insurance carriers declining to renew the Debtors' existing policies or refusing to enter into new agreements with the Debtors.  If the Insurance Programs lapse, the Debtors could be exposed to substantial liability, to the detriment of the Debtors' estates and all parties in interest, as the Debtors would be required to obtain replacement coverage on an expedited basis, likely at significant additional cost.  Moreover, certain of the insurance policies protect collateral pledged to holders of the first and second lien notes.

89.     For all the foregoing reasons, I submit that payment of all Insurance Expenses, and the other relief requested in the motion, is in the best interests of the Debtors'

estates and their creditors and will enable the Debtors to continue to operate their businesses

without disruption.

> **(vi)** **Debtors' Motion, Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 507(a)(8), for Order (I) Authorizing Payment of Prepetition Taxes and Business License Fees to Governmental Entities, and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers**

90.     The Debtors request authority (i) to pay certain prepetition (a) sales, use, and personal property taxes, and (b) franchise, regulatory, permit, and annual reporting fees (as well as any penalties and interest related to (a) and (b)) to various federal, state, and local authorities (collectively, the "Taxing Authorities"), including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Commencement Date; and (ii) to authorize banks and other financial institutions (collectively the "Banks") to honor and process related checks and transfers.

### A.     Sales & Use Taxes

91.     A "sales tax" is a consumption tax calculated as a percentage of the sale price that is charged at the point of purchase for certain goods and services (the "Sales Taxes"). Most of the Debtors' customer invoices do not include Sales Taxes because of various exemptions, so the Debtors typically pay Sales Taxes from their own funds.  Indeed, the Debtors only include Sales Taxes on customer invoices to certain insurance carriers in the state of Washington, where the Debtors are legally permitted to do so.

92.     A "use tax" is a type of excise tax.  It is assessed upon otherwise "tax free" personal property purchased by a resident of the assessing state for use, storage, or consumption of goods in that state, regardless of whether the purchase took place in that state. Vendors are not obligated to charge or remit Sales Taxes for sales to parties outside the state of the vendor's operations.  Nevertheless, a purchaser (such as Rotech) is obligated to self-assess

and pay use taxes, when applicable, to the states in which the purchaser operates (the "Use Taxes," and together with the Sales Taxes, the "Sales & Use Taxes").  The Debtors incur and remit Use Taxes when they purchase property or services from vendors that have no nexus to the state in which the purchasing Debtor operates, and thus no Sales Taxes were collected by the vendor.

93.    As a result of the commencement of these cases, I believe a portion of the monthly Sales & Use Taxes may remain due for the period before the Commencement Date. Accordingly, the Debtors request authority to make such payments in the same manner as they would have been paid before the Commencement Date without further approval from this Court, in an aggregate amount not to exceed $200,000, but also without prejudice to a request by the Debtors to enlarge this amount if a larger amount proves necessary.

94.    In addition, certain Taxing Authorities have assessed additional Sales & Use Taxes on the Debtors that are currently being disputed (collectively, the "Disputed Sales & Use Taxes").  For example, the Debtors are currently disputing an additional assessment of $65,000 in Kentucky for the years 2007 to 2010 and additional assessments totaling $650,000 in Washington for the years 2008 to 2011.  The Debtors believe the ultimate amounts owed for the Disputed Sales & Use Taxes will be lower than the Taxing Authorities' additional assessments, but it is possible that the Debtors may be unsuccessful in their disputes.  Accordingly, the Debtors request further authority to make such payments in an aggregate amount not to exceed $1,000,000 in the same manner as they would have been paid before the Commencement Date without further approval from this Court.

B.    **Personal Property Taxes**

95.    In the course of their operations, the Debtors pay property taxes (the "Property Taxes," and, together with Sales & Use Taxes, the "Taxes") in respect of personal

property owned by the Debtors in certain states.  The Debtors do not pay real property taxes, as they do not own any real property.  The Debtors are billed for Property Taxes in advance at the beginning of the fiscal year by each respective taxing authority, and the majority of Property Taxes are prepaid in advance.  There may be, however, a portion of the Property Taxes that is accrued and unpaid as of the Commencement Date if the Debtors do not pay certain bills immediately.  Accordingly, the Debtors request authority to make such payments in the same manner as they would have paid before the Commencement Date without further approval from this Court, in an aggregate amount not to exceed $150,000, but also without prejudice to a request by the Debtors to enlarge this amount if a larger amount proves necessary.  These taxes are entitled to priority under Bankruptcy Code section 507(a)(8)(B).

### C.      Franchise, Regulatory, Permit, and Annual Report Fees

96.      The Debtors are required to pay certain fees and taxes (the "Fees") in certain states to (i) operate their business (the "Franchise Fees"), (ii) procure and maintain a business license and remain in good standing to operate their facilities (the "Regulatory Fees"), (iii) file required annual reports (the "Annual Report Fees"), and (iv) maintain licenses and permits governing the regulation of the manufacturing of oxygen, the operation of a business in a city or state, and the dispensing of oxygen and/or medication (the "Permit Fees").  Because the Debtors pay in advance their Franchise Fees, no such fees should be due and owing as of the Commencement Date.  However, out of abundance of caution, and in case the Debtors do owe any Franchise Fees, the Debtors request authority to make such payments without further order of this Court, in an aggregate amount not to exceed $10,000, but also without prejudice to a request by the Debtors to enlarge this amount if a larger amount proves necessary.  The manner in which Regulatory Fees and Permit Fees are computed vary according to the laws of the applicable jurisdiction; all such fees, though, are paid in advance on an annual basis.  Although

the Debtors pay these fees in advance, there are some amounts outstanding for resurveys[11] that

recently occurred prior to the Commencement Date.  Therefore, the Debtors request authority to

make such payments without further order of this Court, in an aggregate amount not to exceed

$105,000, but also without prejudice to a request by the Debtors to enlarge this amount if a larger

amount proves necessary.  The Debtors do not believe any Annual Report Fees are accrued and

outstanding as of the Commencement Date, but if they determine Annual Report Fees are due,

the Debtors request authority to make such payments without further order of this Court, in an

aggregate amount not to exceed $10,000, but also without prejudice to a request by the Debtors

to enlarge this amount if a larger amount proves necessary.

97.    Payment of the prepetition Taxes and Fees is critical to the Debtors'

uninterrupted business operations.  Nonpayment of these obligations may cause Taxing

Authorities to take precipitous action, including, but not limited to, preventing the Debtors from

conducting ongoing business in the applicable jurisdictions, increasing audits, and requesting

termination of the automatic stay, all of which would disrupt the Debtors' day-to-day operations.

Indeed, paying the Taxes and Fees may reduce the aggregate amount ultimately paid to the

Taxing Authorities because penalties and interest are often severe and may be avoided by prompt

payment.

98.    Also, I am advised that nonpayment of some of these obligations will

likely result in unwarranted penalties, audits, and the imposition of personal liability on the

officers and directors of the Debtors for Taxes collected but not paid to the applicable authorities.

Thus, to the extent any Taxes remain unpaid, the Debtors' officers and directors may be subject

to audits, lawsuits, or even criminal prosecution on account of such nonpayment during the

---

[11] Resurveys are conducted by the Joint Commission, a nonprofit organization that accredits more than 19,000 health care organizations and programs in the United States, for each of Rotech's nine operational regions on a triennial basis.  The Debtors pay the Joint Commission approximately $80,000 every time a resurvey is conducted.

pendency of these chapter 11 cases.  Such proceedings would constitute a significant distraction

for such officers and directors at a time when they should be focused on stabilizing postpetition

business operations and developing and implementing a successful reorganization strategy.  I am

also advised that the Taxes are afforded priority payment status in a chapter 11 case.  Therefore,

the relief requested will only affect the timing of the payment of Taxes and will not prejudice the

rights of general unsecured creditors or other parities in interest.  Finally, certain of the Taxes

may be so-call "trust-fund" taxes that the Debtors are required to collect from third parties and

hold in trust for the benefit of the Taxing Authorities.  Such "trust-fund" taxes may not constitute

property of the estate.

99.    Based on the foregoing, I submit that paying the Taxes and Fees is well

within the Debtors' sound business judgment and is in the best interest of the Debtors' estates.

**(vii)    Debtors' Motion, Pursuant to Bankruptcy Code Sections 105(a) and 366, for Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Approving the Debtors' Proposed Form of Adequate Assurance, (III) Establishing Procedures for Resolving Objections Thereto by Utility Providers, and (IV) Scheduling a Final Hearing Thereon**

100.    The Debtors are requesting relief to prohibit their utility providers (the

"Utility Providers"), identified on Schedule 2 to the Utilities Motion, from altering, refusing, or

discontinuing utility services to the Debtors as a result of the commencement of these chapter 11

cases, or the existence of any unpaid prepetition invoices, including the making of demands for

security deposits or accelerated payment terms.  The Debtors have proposed adequate assurance

for the Utility Providers, and proposed procedures for resolving Utility Providers' objections to

such procedures and the proposed adequate assurance.

101.    In connection with their ongoing business operations, the Debtors incur

utility expenses in the ordinary course for, among other things, the use of natural gas, electricity,

water, sewer service, local and long-distance telephone service, waste disposal, and other similar

services (collectively, the "Utility Services").  Uninterrupted Utility Services are essential to the

Debtors' ongoing operations.  Moreover, replacement Utility Providers would be difficult to

identify and, in some locations, impossible to find, given that many utilities enjoy a virtual

monopoly in certain regions, leaving consumers with no alternatives.  The business disruption

that would likely result from interruption of the Utility Services would negatively impact the

Debtors' operations, and would adversely affect the Debtors' patients, estates, creditors, and

employees.  Accordingly, to continue as a going concern, the Debtors must continue to receive

uninterrupted Utility Services.

102.    The Debtors intend to pay all postpetition obligations owed to the Utility

Providers in a timely manner, consistent with the ordinary course of operating their businesses.

To provide adequate assurance of payment, as set forth in Bankruptcy Code sections 366(b) and

(c), the Debtors propose to deposit, within 20 days of the Commencement Date, an initial sum to

be determined by calculating 50% of the Debtors' estimated average monthly cost of cumulative

Utility Services obtained from the Utility Providers, but only to the extent that such Utility

Providers do not otherwise hold deposits, security, or letters of credit for their Utility Services

(such other Utility Providers, the "Secured Utilities") (the "Adequate Assurance Deposit").  The

Secured Utilities shall be deemed to be adequately assured of the Debtors' continued

performance by virtue of their existing letters of credit, deposits, or other security.  The Adequate

Assurance Deposit will be deposited into an interest-bearing, segregated account (the "Adequate

Assurance Account").  The Debtors estimate the initial Adequate Assurance Deposit to be

$572,000.

103.    The Debtors further propose to maintain this amount in the Adequate

Assurance Account until there is a further hearing on this matter.  Thereafter, the Debtors

propose to adjust the amount of the Adequate Assurance Deposit in the Adequate Assurance

Account to maintain an Adequate Assurance Deposit that consistently provides the Utility

Providers with coverage for half of an average month's usage of the applicable Utility Services,

and any additional amounts deemed necessary to maintain the Utility Services.

104.    I believe that the Adequate Assurance Deposit and the Adequate

Assurance Account, taken together with the facts and circumstances of the Debtors' chapter 11

cases (together, the "Proposed Adequate Assurance"), constitute sufficient adequate assurance to

the Utility Providers.  If any Utility Provider believes adequate assurance is required beyond the

Proposed Adequate Assurance, however, it must request such additional assurance pursuant to

the procedures described below (the "Adequate Assurance Procedures").

105.    The relief requested ensures the Debtors' business operations will not be

disrupted by the lack of critical Utility Services.  Absent approval of the proposed Adequate

Assurance Procedures, the Debtors could be forced to negotiate with each Utility Provider

individually with the risk that a Utility Provider will delay until they have the ability to terminate

service.  During this critical postpetition period, the Debtors' efforts and resources would

unquestionably be more productive if focused on their restructuring.

106.    The Debtors request a further hearing on the Utilities Motion to be held

within 25 days of the Commencement Date to ensure that, if a Utility Provider argues it can

unilaterally refuse service to any of the Debtors on the 31st day after the Commencement Date,

the Debtors will have had the opportunity to request modifications to the proposed Adequate

Assurance Procedures to avoid any potential termination of Utility Services.

**(viii)  Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 363(b) and 105(a) Authorizing (i) the Debtors to Pay the Prepetition Claims of Certain Critical Vendors and Administrative Claimholders Pursuant to Bankruptcy Code Section 503(b)(9), and (ii) Financial Institutions to Honor and Process Prepetition Checks and Transfers to Certain Critical Vendors and Administrative Claimholders**

107.    The Debtors request entry of an order authorizing (i) the Debtors, in their discretion, to pay the prepetition claims of certain critical vendors (the "Critical Vendors") that delivered goods or provided services to the Debtors before the Commencement Date (the "Critical Vendor Claims") and claims of administrative claimholders (the "Administrative Claimholders")[12] pursuant to Bankruptcy Code section 503(b)(9) (the "Administrative Claims") in the ordinary course of business, according to established business practices, and (ii) the Debtors' banks and financial institutions (collectively, the "Banks") to honor and process prepetition checks and transfers to certain Critical Vendors and Administrative Claimholders. The Debtors estimate that the Critical Payments will total approximately $29 million in the aggregate.  Of those payments, the Debtors estimate that Critical Vendor Payments will not exceed approximately $16.9 million (the "Critical Vendor Cap").[13]  The Debtors estimate that approximately $12.1 million (the "Administrative Claims Cap") of the $29 million would be Administrative Claims entitled to administrative priority status pursuant to section 503(b)(9) of the Bankruptcy Code, because they relate to goods delivered to the Debtors in the ordinary course of business within twenty days before the Commencement Date.  The Debtors propose making such payments to those Critical Vendors and Administrative Claimholders that agree to supply goods and/or services postpetition to the Debtors according to the ordinary course trade terms (including pricing) that existed before the Commencement Date, or on better terms.

---

[12] Certain Critical Vendors may also have Administrative Claims.

[13] The Debtors reserve the right to seek to increase the Critical Vendor Cap and the Administrative Claims Cap at a later date (if necessary), subject to this Court's approval.

#### (a)   *The Critical Vendors*

108.   The Critical Vendors provide the Debtors with the following three general categories of goods and services:  (i) supply and transportation of Home Medical Equipment and Respiratory Services required by physician prescription; (ii) supply and transportation of other Home Medical Equipment and Respiratory Services and related items; and (iii) patient follow-up, billing, and collection services.

#### (b)   *Selection of Critical Vendors*

109.   As described in the Motion, the Debtors have examined the extent to which payment of Critical Vendor Claims is necessary to avoid irreparable harm and to ensure the Debtors have access to adequate amounts of trade credit on a postpetition basis.  Specifically, the Debtors have reviewed their accounts payable and have undertaken a process to identify those vendors truly essential to the Debtors' operations.  The Debtors have further developed certain procedures (for which they seek this Court's approval) that, when implemented, will ensure that vendors receiving payment of Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis and in accordance with the terms of the parties' prepetition dealings, or on terms more favorable to the Debtors.

#### (c)   *Payment of Critical Vendors and Administrative Claimholders*

110.   The Debtors seek authority to pay Critical Vendors Claims and Administrative Claims at their discretion, in the ordinary course of business, according to their established business practices.  The Debtors propose to condition the payment of Critical Vendor Claims and Administrative Claims on the agreement of the individual Critical Vendor or Administrative Claimholder to continue supplying goods to the Debtors on the most favorable terms in effect between such Critical Vendor or Administrative Claimholder and the Debtors in the 12 months before the Commencement Date, or on terms more favorable to the Debtors to

which the Debtors and the Critical Vendor or Administrative Claimholder may otherwise agree (the "Customary Trade Terms").[14]  The Debtors seek the authority to obtain written verification before issuing payment to a Critical Vendor or Administrative Claimholder that such Critical Vendor or Administrative Claimholder will continue to provide goods and services to the Debtors on Customary Trade Terms throughout the Debtors' chapter 11 cases and for the twelve-month period commencing on the date the Debtor's plan of reorganization is consummated.

111.    If a Critical Vendor or Administrative Claimholder accepts a payment on account of a prepetition obligation of the Debtors (a "Vendor Payment") and thereafter fails to provide the Debtors with the requisite Customary Trade Terms (each such Critical Vendor or Administrative Claimholder, a "Defaulting Vendor"), the Debtors seek authority to (i) treat any Vendor Payment received by the Defaulting Vendor as an unauthorized postpetition transfer under Bankruptcy Code section 549 that the Debtors may (a) recover from the Defaulting Vendor in cash or goods, or (b) at the Debtors' option, apply as a credit against any outstanding postpetition claims held by such Defaulting Vendor, and (ii) upon recovery of any Vendor Payment under clause (a) or (b), reinstate the prepetition claim of the Defaulting Vendor in the amount recovered by the Debtors, less the Debtors' reasonable costs incurred in recovering such amounts.  Further, by virtue of having accepted a Vendor Payment, each Critical Vendor or Administrative Claimholder shall be deemed to have waived any and all defenses it might otherwise have against the Debtors with respect to any action commenced by the Debtors under Bankruptcy Code section 549 as described immediately above.  In essence, the Debtors seek to return the parties to their respective positions immediately before entry of the Order if a Critical

---

[14]  For the avoidance of doubt, the Debtors are not seeking authority to pay Critical Vendor Claims and Administrative Claims to any creditor other than Critical Vendors and Administrative Claimholders with respect to which this condition has been satisfied.

Vendor or Administrative Claimholder refuses to supply goods to the Debtors on Customary Trade Terms following payment of its Critical Vendor Claim or Administrative Claim.

112.    For those Critical Vendors and Administrative Claimholders who have agreed to provide goods to the Debtors on the Customary Trade Terms, the Debtors believe that their contracts with the Critical Vendors and Administrative Claimholders are at competitive rates and terms.  Therefore, the continuation of business on the same or better terms would facilitate the Debtors' reorganization.

113.    The Debtors and their patients are highly dependent on the continuous delivery of Home Medical Equipment and Respiratory Services, uninterrupted maintenance, and other related services.  Notably, the Debtors' services are generally governed by terms of various provider contracts and applicable regulations.  Any failure to provide continuous delivery of Home Medical Equipment and Respiratory Services to patients could result in a breach of these contracts, and may lead to investigations, deficiency citations, regulatory sanctions, and other remedial actions by the governmental agencies monitoring the Debtors, which would impair the Debtors' reorganization efforts.  Such events could not only have a catastrophic effect on the Debtors' business, but could also cause the Debtors' patients to suffer harmful delay in receiving life-supporting services.  In addition, the Debtors' businesses are highly dependent on an efficient billing and collection system, which ensures prompt collection from both third-party payors and private payors.  The Debtors' inability to secure timely payments would severely affect the Debtors' cash flow at a time when it is most crucial.

114.    The Debtors believe that the payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because, in various instances, the Critical Vendors are the only source from which the Debtors can procure certain goods and services within a time

48

frame and at a price that will permit the Debtors to continue operating their businesses.  Failure

to pay the Critical Vendor Claims would likely result in Critical Vendors refusing to provide

goods and services to the Debtors postpetition and may force the Debtors to obtain, if at all

possible, such goods and services elsewhere at a higher price or in a quantity or quality that is

insufficient to satisfy the Debtors' requirements.  While such vendors' actions may well be

violations of the automatic stay, there is no assurance that the Debtors can obtain remedies that

are timely enough and sufficient to avert the potentially disastrous consequences of a supply or

service disruption.  In addition, certain Critical Vendors may be able to assert possessory liens,

or mechanics' or materialmen's liens on goods that are critical to maintaining Debtors'

operations.

        115.     Significantly, the majority of Critical Vendors are irreplaceable because

they provide unique Home Medical Equipment and Respiratory Services specifically required by

physician prescriptions.  For example, if a physician orders a CPAP device provided by a

specific supplier, the Debtors cannot deliver a CPAP device provided by a different supplier.

The Debtors have no influence on particular products prescribed by physicians, but must deliver

the exact item written in the prescription.  The Debtors cannot afford to fail to follow physician

prescriptions and seek to deliver replacement items provided by a different vendor.  Non-

compliance with physician prescriptions may lead to revocation of the Debtors' licenses to

operate.  Such failure would also inevitably result in the loss of customers and goodwill at a time

when it is most critical for the Debtors to reassure its patients and other business partners that its

established quality and reliability will continue.

        116.     Given the paramount importance of the goods and services provided by

the Critical Vendors, the Debtors believe authority to pay Critical Vendor Claims is vital to

preserve their trade credit on a postpetition basis and prevent vendors from ceasing to do business with the Debtors altogether.

> **(ix)     Debtors' Motion Pursuant to Bankruptcy Code Sections 363(b), 503(b)(1), and 105(a) for Order (i) Authorizing Debtors to Honor Certain Prepetition Customer Programs, and (ii) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

117.    The Debtors request authority to perform and honor their prepetition obligations under certain customer programs (the "Customer Programs"), to continue these Customer Programs in the ordinary course of their businesses, and an authorization of the Debtors' banks and financial institutions to honor and process checks and other payment transfers related to such obligations.

118.    The Customer Programs, and the benefits thereunder, are available to the Debtors' patients (the "Customers"), who use the Debtors' respiratory equipment and related supplies, durable medical equipment and related accessories and supplies, nebulizer machines and medications, and home enteral nutrition products and related supplies.  To survive in the competitive home healthcare industry, the Debtors firmly believe they must maintain the goodwill of their Customers by assuring them of the Debtors' continued ability to satisfy their obligations under the Customer Programs, which, among other things, ensure uninterrupted and safe use of the Debtors' equipment and supplies.  In sum and substance, although honoring the Customer Programs includes paying prepetition obligations, the expense is no different than a postpetition, administrative marketing expense that creates more value for the Debtors' estates than it costs them.  Without the Customer Programs, the Debtors would not be competitive and could lose their Customers.

(a)    *Maintenance and Service*

119.    The Debtors maintain certain programs designed for standard preventive maintenance to ensure that equipment remains in safe, working order (the "Maintenance and Service Program"), primarily with respect to (i) respiratory equipment, (ii) DME, and (iii) nebulizer machines.  Generally, products leased by Customers are eligible for maintenance and service free of charge to the Customer for a period of time that varies by product, after which a Customer or its third-party payor pays a flat maintenance and service fee, which covers a six-month period, if maintenance and service is be provided at least once in the applicable six months.  Conversely, products owned by the Customer (usually purchased after the Customer has first leased the product) may be maintained and serviced by the Debtors, but are subject to standard costs of maintenance and service per visit.

120.    Generally, maintenance and service activities are provided for all leased products, regardless of the payor, and for Customer–owned equipment only when requested.  As explained below, there are differences in treatment with respect to Customers eligible for Medicare benefits, or covered by other payors following Medicare rules, as opposed to Customers covered by payors not following Medicare rules.  The Debtors do not maintain any reserve to support the Maintenance and Service Program.  Estimated annual costs for the combined Maintenance and Service Program and Repairs Program (as defined below) average approximately $3.4 million.

(b)    *Repairs*

121.    The Debtors maintain certain equipment repair programs to help mitigate equipment malfunction (the "Repairs Program"), primarily with respect to (i) respiratory equipment; (ii) DME; and (iii) nebulizer machines.  Similarly to the Maintenance and Service Program, products leased by Customers are eligible for repair free of charge to the Customer up

until a certain period of time, which varies by product, after which a Customer or its third-party payor pay the cost of repairs to include parts and labor unless replacement of equipment is less costly.  All repairs of VA-owned equipment are billed by the Debtor and paid by the VA.  The Debtors do not maintain any reserve to support the Repairs Program.

(c)    ***Warranties***

122.    The Debtors maintain a limited warranty program (the "Warranty Program") for used equipment (normally previously leased by the Customers), including RAD, DME, and nebulizer machines purchased from the Debtors, limited to parts and labor, subject to notification within 90 days of the Customer assuming ownership.  Generally, all equipment the Debtors lease or sell to Customers is only subject to the manufacturer's warranty.  Any refunds and exchanges covered by the manufacturer generally only apply to new or unused items.  Other refunds and exchanges are covered by the Debtors' Refunds and Exchanges Program (as defined below).  The Warranty Program helps ensure that the Debtors' equipment functions properly for the life of the product.  Warranty claims represent *de minimis* amounts.  Currently, the Debtors do not maintain any reserve to support the Warranty Program.

(d)    ***Refunds and Exchanges***

123.    The Debtors also maintain a refund and exchange program (the "Refund and Exchange Program").  Most commonly, refunds occur in the following cases: (i) a patient pays a statement that is later paid by a third-party payor, and the patient is refunded; (ii) the patient overpays the statement and is refunded; (iii) the delivered item is paid for and returned, and the payor is refunded.  With respect to rented items (e.g. Oxygen Equipment, RAD, DME, and nebulizer machines), only unopened or unused items may be eligible for exchange or a refund under the manufacturer warranty.  Other exchanges and refunds are covered by the

Debtors, who accept certain products for exchange or refund within 30 days of purchase.[15]

Refunds are subject to management discretion.  The Refunds and Exchanges Program applies to

all Customers in the same way, regardless of the payor.  Estimated annual reserves for the

Refund and Exchange Program average approximately $3.7 million at any given time.  However,

this includes refunds to third-party payors that are offset against any future benefits.  In 2012, the

reserve for patient refunds totaled $2.3 million.

(e)        <strong><em>Call Centers</em></strong>

124.     To further support the Customers' concerns and questions regarding the

Debtors' products or services and to comply with mandatory Medicare Supplier Standards, the

Debtors provide 24-hour on-call support to their patients through a centralized after-hours call

center operated out of the Debtors' facility in Murray, Kentucky.  The Debtors also engage third-

party providers to operate call centers for billing questions (operated by Alliance One) and

questions related to CPAP supplies (operated by MedSage), for an annual cost of $1.2 million.

As of the Commencement Date, the Debtors estimate approximately $217,000 is outstanding due

to vendors for services performed in connection with the Call Centers.

125.     The Debtors believe the Customer Programs are integral to sustaining their

relationships and goodwill with the Customers, as well as indispensable to maintaining the

confidence of Customers in the products they lease or purchase from the Debtors.  Furthermore,

the cost of these Customer Programs is truly minimal in comparison to the level of comfort,

safety, and satisfaction they provide the Customers, which translates into larger value for the

Debtors' enterprise.

---

[15] Any exchanges after the 30-day period may be covered by the Maintenance and Service or Repairs Programs.

(x)     **Debtors' Application, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Code Section 105(a), Bankruptcy Rule 2002 and Local Rule 2002-1(f), for Order (I) Authorizing the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent for the Debtors and (II) Appointing Epiq Bankruptcy Solutions, LLC Agent of the Bankruptcy Court**

126.    The Debtors request authority to employ and retain Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent for the Debtors and to appoint Epiq as agent of this Court.

127.    The Debtors have more than two hundred (200) creditors.  Retaining Epiq as claims and noticing agent is in the best interest of the Debtors and their estates, because use of Epiq is the most effective and efficient manner of providing notice to the Debtors' creditors and other parties in interest of the commencement and other developments of these chapter 11 cases. In that capacity, Epiq will transmit, receive, docket and maintain proofs of claims filed in connection with these chapter 11 cases.

128.    I am advised that Epiq is a bankruptcy administration provider that specializes in comprehensive chapter 11 administrative services including noticing, claims processing, balloting and other related services critical to the effective administration of chapter 11 cases.  Indeed, Epiq has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest.  Further, Epiq will work with the Clerk to ensure that such methodology conforms with the Court's procedures, the Local Rules and the provisions of any orders entered by this Court.

**(xi)    Debtors' Application, Pursuant to Bankruptcy Code Sections 327(a) and 328(a), Bankruptcy Rule 2014(a), and Local Rule 2014-1, for Authorization to Employ and Retain Proskauer Rose LLP as Attorneys for the Debtors *Nunc Pro Tunc* to the Commencement Date**

129.    At a later date, the Debtors plan to file an application seeking the Court's approval of the employment and retention of Proskauer, as their general bankruptcy counsel, *nunc pro tunc* to the Commencement Date, to perform legal services necessary during these chapter 11 cases, in accordance with Proskauer's normal hourly rates and reimbursement policies in effect when services are rendered.

130.    The Debtors seek to retain Proskauer because of the firm's longstanding relationship with the Debtors, broad understanding of the Debtors' business operations, and extensive experience in business reorganization.  During the past several months, Proskauer, working together with the Debtors' other professionals, was primarily responsible for the preparation of the chapter 11 petitions, initial motions, and applications relating to the Debtors' chapter 11 cases and their commencement, as well as the Debtors' chapter 11 plan, which effectuates the Plan Support Agreement upon which these cases are predicated.  During the course of this representation, Proskauer has become intimately familiar with the Debtors' businesses, financial affairs, capital structure, and restructuring alternatives.  Proskauer has navigated the Debtors through the preparation of these chapter 11 cases and the Plan process, and has the necessary background and invaluable knowledge to deal effectively with the potential legal issues and problems that may arise in the context of the Debtors' chapter 11 cases, and to successfully complete the Debtors' chapter 11 process.  In addition, to the extent they become necessary, Proskauer has extensive resources beyond its restructuring practice, which is comprised of, among other experienced professionals, attorneys who have previously advised Rotech and are familiar with its business.

131.    As of this date, and to the best of my knowledge, the members of, counsel to, and associates of, Proskauer do not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest, or their respective attorneys and accountants, except as may be set forth in the Bienenstock Declaration.  In view of the foregoing, I submit Proskauer is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

132.    I believe Proskauer is both well-qualified and able to successfully represent the Debtors in their chapter 11 cases.  Therefore, I submit the relief requested in the application is necessary and appropriate, and in the best interest of the Debtors, their estates, and their creditors, and should be granted in all respects.

**(xii)    Application of the Debtors for an Order Authorizing the Retention and Employment of Young Conaway Stargatt & Taylor, LLP as Bankruptcy Co-Counsel to the Debtors, Effective as of the Petition Date**

133.    At a later date, the Debtors also plan to file an application to retain and employ Young Conaway as their bankruptcy co-counsel in these chapter 11 cases, effective as of the Commencement Date.

134.    The Debtors seek to retain Young Conaway as their bankruptcy co-counsel because of the Firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Additionally, the Debtors submit that Young Conaway's expertise, experience, and knowledge practicing before this Court will be efficient and cost-effective for the Debtors' estates.  In preparing for the chapter 11 cases, Young Conaway has become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise as these cases proceed.  Accordingly, the Debtors believe that Young Conaway is both well qualified and

uniquely able to represent them as bankruptcy co-counsel in these chapter 11 cases in a most efficient and timely manner.

135.     Young Conaway will work closely with Proskauer and each of the other professionals retained by the Debtors in connection with these chapter 11 cases whose retentions are approved by this Court to ensure that there is no unnecessary duplication of effort or cost.

136.     As of this date, and to the best of my knowledge, and except as disclosed in the application and in the Brady Declaration, Young Conaway has not represented the Debtors, their creditors or any other parties-in-interest, or their respective attorneys, in any matter relating to the Debtors or their estates.  In view of the foregoing, I submit Young Conaway is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

137.     In addition, the Debtors currently plan to file applications to employ and retain (i) Epiq, as administrative advisor; (ii) Barclays Capital Inc., as financial advisor; (iii) AlixPartners LLP, as restructuring advisor; (iv) Deloitte & Touche LLP as independent auditor; (v) Foley & Lardner LLP, as regulatory counsel; (vi) KPMG LLP, as independent review organization; and (vii) Davis Polk & Wardwell LLP, as counsel to the Special Committee of the Board of Directors of Rotech.  These applications will be filed with adequate notice to be heard at the first appropriate time.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 7, 2013.

/s/ Steven P. Alsene
Steven P. Alsene

## **<u>Schedule 1</u>**

**List of Debtors**

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are,

A-1 Medical Equipment, Inc. (4401);
Abba Medical Equipment, Inc. (4117);
Acadia Home Care (6177);
Allied Medical Supply, Inc. (3257);
Always Medical Equipment, Inc. (7512);
Andy Boyd's InHome Medical, Inc., West (9187);
Andy Boyd's InHome Medical/InHome Medical Inc. (4360);
Anniston Health & Sickroom Supplies, Inc. (9873);
Berkeley Medical Equipment, Inc. (2227);
Best Care HHC Acquisition Company LLC (2125);
Beta Medical Equipment, Inc. (4408);
Cambria Medical Supply, Inc. (0476);
Camden Medical Supply, Inc. (3186);
Care Medical Supplies, Inc. (5959);
Centennial Medical Equipment, Inc. (6826);
Charlotte Medical Supply, Inc. (8925);
Collins Rentals, Inc. (2037);
Community Home Oxygen, Inc. (0456);
Contour Medical Supply, Inc. (6882);
Corley Home Health Care, Inc. (9882);
CPO 2, Inc. (1084);
Daniel Medical Systems, Inc. (7988);
Distinct Home Health Care, Inc. (3941);
Don Paul Respiratory Services, Inc. (7602);
DuMEd, Inc. (6634);
East Tennessee Infusion & Respiratory, Inc. (7561);
Ellis County Home Medical Equipment, LLC (9841);
Encore Home Health Care, Inc. (1477);
Excel Medical of Fort Dodge, Inc. (4351);
Excel Medical of Marshalltown, Inc. (6085);
First Community Care of Niagara, Inc. (1366);
Firstcare, Inc. (4362);
Fischer Medical Equipment, Inc. (1262);
Four Rivers Home Health Care, Inc. (6602);
G&G Medical, Inc. (3419);
Gate City Medical Equipment, Inc. (9037);
Georgia Medical Resources, Inc. (4343);
Gladwin Area Home Care, Inc. (0154);
Hamilton Medical Equipment Service, Inc. (9500);
Health Care Services of Mississippi, Incorporated (3038);
Holland Medical Services, Inc. (0731);
Home Care Oxygen Service, Inc. (5036);
Home Medical Systems, Inc. (4523);
IHS Acquisition XXVII, Inc. (8938);
Integrated Health Services at Jefferson Hospital, Inc. (3408);
Intensive Home Care Services, Inc. (3364);
IOTA Medical Equipment, Inc. (6769);
Lambda Medical Equipment, Inc. (4213);
LAMS, Inc. (3169);
Lovejoy Medical, Inc. (7284);
Major Medical Supply, Inc. (3420);
Medco Professional Services, Corp. (8104);
MedCorp International, Inc. (1512);
Medic-Aire Medical Equipment, Inc. (4409);
Medical Electro-Therapeutics, Inc. (3806);
Medicare Rental Supply, Inc. (4420);
Michigan Medical Supply, Inc. (1565);
National Medical Equipment Centers, Inc. (4381);

NeighborCare Home Medical Equipment, LLC (4608);
NeighborCare Home Medical Equipment of Maryland, LLC (7083);
Neumann's Home Medical Equipment, Inc. (4719);
Nightingale Home Health Care, Inc. (3784);
North Central Washington Respiratory Care Services, Inc. (4195);
Northeast Medical Equipment, Inc. (5262);
Northwest Home Medical, Inc. (8664);
OMICRON Medical Equipment, Inc. (4215);
Oxygen of Oklahoma, Inc. (4965);
Oxygen Plus Medical Equipment, Inc. (4115);
Oxygen Plus, Inc. (3534);
Oxygen Therapy Associates, Inc. (1923);
Peterson's Home Care, Inc. (9765);
PHI Medical Equipment, Inc. (6766);
Pioneer Medical Services, Inc. (9719);
Preferential Home Health Care, Inc. (5850);
Principal Medical Equipment, Inc. (7513);
Professional Breathing Associates, Inc. (1020);
Professional Respiratory Home Healthcare, Inc. (4111);
PSI Health Care, Inc. (0287);
Pulmo-Dose, Inc. (8866);
Qualicare Home Medical, Inc. (4849);
Quality Home Health Care, Inc. (4571);
R.C.P.S., Inc. (9101);
RCG Information Services Corporation (3052);
Regency Medical Equipment, Inc. (7515);
Resp-A-Care, Inc. (6717);
Respiracare Medical Equipment, Inc. (8640);
Respiratory Medical Equipment of Ga., Inc. (5258);
Respitech Home Health Care, Inc. (0603);
Responsive Home Health Care, Inc. (2438);
Rhema, Inc. (2932);
Ritt Medical Group, Inc. (0564);
RN Home Care Medical Equipment Company, Inc. (2598);
Roswell Home Medical, Inc. (8647);
Rotech Employee Benefits Corporation (8434);
Rotech Healthcare Inc. (8870)
Rotech Home Medical Care, Inc. (9059);
Rotech Oxygen and Medical Equipment, Inc. (0889);
Roth Medical, Inc. (7477);
Rother's Hospital Equipment, Inc. (0420);
Sampson Convalescent Medical Supply, Inc. (0509);
Select Home Health Care, Inc. (3150);
Sigma Medical Equipment, Inc. (7143);
Southeastern Home Health, Inc. (8645);
Sun Medical Supply, Inc. (4796);
Sunshine Home Health Care, Inc. (1497);
The Kilroy Company (3738);
Theta Home Health Care, Inc. (9824);
Tupelo Home Health, Inc. (7024);
Valley Medical Equipment, Inc. (7456);
Value Care, Inc. (0410);
VitalCare Health Services, Inc. (3938);
VitalCare of Texas, Inc. (5707);
White's Medical Rentals, Inc. (0401);
Wichita Medical Care, Inc. (6368);
Zeta Home Health Care, Inc. (0414).

## **Exhibit A**

**Wages Chart**

## Estimate of Employee-Related Accrued and Owing Liabilities as of Commencement Date[*]

| OBLIGATION | EXPLANATION | [A]<br>Entitled to Priority<br>under § 507 | [B]<br>Priority and Trust<br>Fund Taxes | [C]<br>Other | [D] = [A] + [B] + [C]<br>Total |
|---|---|---|---|---|---|
| Basic Pay – Salaried Employees (Net) | Gross wages accrued up to the Commencement Date.  Paid as bi-weekly payrolls become due. | 2,424,000 | | | 2,424,000 |
| Basic Pay – Hourly Employees (Net) | Gross wages accrued up to the Commencement Date.  Paid as bi-weekly payrolls become due. | 1,703,000 | | | 1,703,000 |
| Third-Party Sourced Personnel Costs – Staffing Agencies | Accrued and unpaid prepetition obligations. | | | 343,000 | 343,000 |
| Third-Party Sourced Personnel Costs – IND | Accrued and unpaid prepetition obligations. | | | 158,000 | 158,000 |
| Third-Party Sourced Personnel Costs – AmEx Travel | Accrued and unpaid prepetition obligations. | | | 6,000 | 6,000 |
| Sales Incentive Plans (SIPs commissions) | Amounts earned by Sales Employees in Q1, 2013, and in the month of March, 2013. | 1,300,000 | | | 1,300,000 |
| Field Bonus Plan (commissions) | Amounts earned by field Employees in Q1, 2013. | 1,000,000 | | | 1,000,000 |
| Billing Center Bonus Plan (commissions) | Amounts earned by billing Employees in Q1, 2013. | 50,000 | | | 50,000 |
| Recognition Program | Accrued amount as of the Commencement Date. | | | 6,000 | 6,000 |
| Milestone Award Program | Accrued amount as of the Commencement Date. | | | 5,000 | 5,000 |
| Payroll Taxes | Estimated employee withholding plus Employer portion of FICA. | | 0 | | 0 |
| Garnishments | Estimated Employee withholding. | 0 | | | 0 |
| Payroll Service Fees | Amount due ADP as of the Commencement Date.  Invoiced monthly. | | | 35,000 | 35,000 |
| General Business Expense Reimbursements | Expenses incurred but not reimbursed up to the Commencement Date.  Paid to Employees as they file expense reports. | | | 78,000 | 78,000 |
| Transportation Reimbursement Costs | Expenses accrued, and incurred but not reimbursed, up to the Commencement Date. | | | 67,000 | 67,000 |
| Telecommunications Reimbursements Costs | Expenses accrued, and incurred but not reimbursed, up to the Commencement Date. | | | 35,000 | 35,000 |
| Relocation Expense Reimbursements | Expenses incurred but not reimbursed up to the Commencement Date. | | | 7,000 | 7,000 |
| Medical Insurance | Expected liability under the plans as of the Commencement Date.  Claims are paid weekly and administrative fee is paid monthly. | 985,000 | | | 985,000 |

---

[*] The Debtors are seeking authorization to pay all obligations set forth herein.  The Debtors and their professionals have attempted to delineate the Debtors' various Employee Obligations into the appropriate priority columns, as reflected in this Schedule 4, however some Employee Obligations, or portions thereof, may be determined to belong in a different column.

| OBLIGATION | EXPLANATION | [A]<br>Entitled to Priority under § 507 | [B]<br>Priority and Trust Fund Taxes | [C]<br>Other | [D] = [A] + [B] + [C]<br>Total |
|---|---|---|---|---|---|
| Stop Loss Insurance | Estimated accrued premiums and administrative fees as of the Commencement Date. | | | 36,000 | 36,000 |
| Statutory Medical Insurance - Hawaii | Estimated accrued premiums as of the Commencement Date. | 500 | | | 500 |
| Executive Medical Reimbursement Plan | Estimated accrued premiums as of the Commencement Date. | 34,000 | | | 34,000 |
| Prescription Drug Coverage | Expected liability under the plans as of the Commencement Date. Claims are paid weekly and administrative fee is paid monthly. | 49,000 | | | 49,000 |
| Employee Assistance Plan | Accrued administrative fees as of the Commencement Date, paid monthly. | 4,000 | | | 4,000 |
| Dental Insurance | Expected liability under the plans as of the Commencement Date. Claims are paid weekly and administrative fee is paid monthly. | 51,000 | | | 51,000 |
| Vision Plan | Withheld from Employees and paid to VSP by the Debtors monthly | 5,000 | | | 5,000 |
| Flexible Spending Accounts | Claims amounts withheld from Employees and paid by the Debtors to WageWorks weekly. | 13,000 | | | 13,000 |
| Basic Life and AD&D Insurance | Estimated accrued premiums as of the Commencement Date | | | | |
| Supplemental Life Insurance | Withheld from Employees and paid to Cigna by the Debtors monthly | | | | |
| Short-Term Disability Insurance | Withheld from Employees and paid to Cigna by the Debtors monthly | | | | |
| Statutory Temporary Disability Insurance – Hawaii | Estimated accrued premiums as of the Commencement Date. Paid quarterly through Cigna. | 23,000 | | | 23,000 |
| Statutory Temporary Disability Insurance – New York | Estimated accrued premiums as of the Commencement Date.  Paid quarterly through Cigna. | | | | |
| Long-Term Disability Insurance | Estimated accrued premiums as of the Commencement Date. | | | | |
| Holiday and Floating Holiday Pay | Amount earned, taken, and unpaid as of the Commencement Date. | 0 | | | 0 |
| Paid Time Off | Amount earned, taken, and unpaid as of the Commencement Date. | 0 | | | 0 |
| 401k Plan | Amounts withheld from Employees and remitted to Principal weekly.  Accrued administrative fees as of the Commencement Date. | 50,000 | | | 50,000 |
| Severance Obligations | Accrued and unpaid prepetition obligations. | 48,000 | | | 48,000 |
| **Total Prepetition Liability** | | **7,739,500** | **0** | **776,000** | **8,515,500** |

**<u>Exhibit B</u>**

**Insurance Chart**

| INSURANCE PROGRAMS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **LINE OF COVERAGE (POLICY NUMBER)** | **TERM** | **PREMIUM** | **INCLUDED COMMISSION** | **TAXES AND SURCHARGES** | **LIMITS** | **DEDUCTIBLE OR RETENTION (SIR)** | **CARRIER(S)** |
| Workers Compensation/ Employers' Liability | 3/26/2013 to 6/26/2013 | $289,492 | $7,500 | $7,787.00 | WC: Statutory EL: $1 million | $250,000 deductible | Ace American Insurance Co. |
| Automobile Liability | 3/26/2013 to 6/26/2013 | $157,226 | $11,000 | $5,152.00 | $2,000,000 | $250,000 deductible | Ace American Insurance Co. |
| Retention Clash Coverage | 3/26/2013 to 6/26/2013 | $6,725 | ----- | $430.31 | $250,000 | ----- | Illinois Union Insurance Co. (Ace American Insurance Co.) |
| <<Third Party Claim Handling Services>> | 3/26/2013 to 6/26/2013 | $31,768 | ----- | ----- | ----- | ----- | ESIS, Inc. |
| General Liability Professional Liability | 3/26/2013 to 3/26/2014 | $312,500 | ----- | $13,109.96 | GL $1 million/ $3 million PL $1 million/ $3 million/ $3 million | GL $250,000 PL $250,000 SIRs | Columbia Casualty Company (CNA) |
| Umbrella Liability | 3/26/2013 to 3/26/2014 | $290,000 | ----- | $12,166.03 | $14,000,000 | $10,000 SIR | Columbia Casualty Company (CNA) |
| Excess Liability | 3/26/2013 to 3/26/2014 | $67,200 | ----- | $2,819.16 | $11,000,000 | ------ | Homeland Insurance Company of New York (One Beacon) |
| Excess Liability | 3/26/2013 to 3/26/2014 | $56,000 | ----- | $2,349.32 | $10,000,000 | ------ | Ironshore |

1

| INSURANCE PROGRAMS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **LINE OF COVERAGE (POLICY NUMBER)** | **TERM** | **PREMIUM** | **INCLUDED COMMISSION** | **TAXES AND SURCHARGES** | **LIMITS** | **DEDUCTIBLE OR RETENTION (SIR)** | **CARRIER(S)** |
| Property | 3/26/2013 to 3/26/2014 | $308,511 | $50,904.32 | $2,254.00 | $75,000,000 | $25,000 deductible | Great Northern Insurance Co. (Chubb) |
| Crime | 3/26/2011 to 3/26/2014 | $33,569 | $5,035.35 | ----- | $10,000,000 | $100,000 SIR | Zurich American Insurance Co. |
| Special Crime | 3/26/2011 to 3/26/2014 | $9,500 | pre-paid | pre-paid | $10,000,000 | ------ | HCC Specialty – US Specialty Insurance Company |
| Employment Practices Primary Punitive Damages | 3/26/2013 to 3/26/2014 | $95,500 $9,550 | $14,325.00 $1,000.00 | $1,242.00 ----- | $15,000,000 $15,000,000 | $500,000 $500,000 SIRs | Axis Insurance Company |
| Employed Lawyers | 3/26/2013 to 3/26/2014 | $16,556 | $2,152.28 | $215.00 | $5,000,000 | $100,000 SIR | Illinois National Insurance Company (Chartis) |
| Fiduciary Liability | 3/26/2013 to 3/26/2014 | $128,231 | $19,875.81 | $1,667.00 | $10,000,000 | $25,000 SIR | Travelers Casualty and Surety Co. of America |
| Directors and Officers Claims Made Policies Run-Off Policies | 3/27/2013 to 3/27/2014 ----------- chapter 11 emergence to six years later | $877,224 $1,512,712 | $135,487.73 $233,512.91 | $11,815.76 $20,283.04 | $70,000,000 $70,000,000 | $500,000 $500,000 SIRs (for indemnifiable claims) | Travelers Casualty and Surety Co. of America Continental Casualty Company (CNA) Axis Insurance Company ACE American Insurance Company Illinois National Insurance Company (Chartis) XL Specialty Insurance Co. Aspen Specialty Insurance Co. |
| **TOTALS** | | **$4,202,264** | **$480,793**** | **$81,291** | | | |
| | | | | | | **TOTAL INSURANCE EXPENSES = 4,283,555** | |

** Commission amount is included in premium amount.

2