IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------x
: Chapter 11
*In re* :
: Case No. 13-10741 (PJW)
**ROTECH HEALTHCARE INC.,** *et al.*, :
: Jointly Administered
Reorganized Debtors.[1] :
: Related to Docket No. 1201
:
: Objection Deadline: November 12, 2013 at 4:00 p.m.
: (ET)
: Hearing Date: November 21, 2013 at 11:00 a.m. (ET)
-----------------------------------------------------x
:
**BAKER & MCKENZIE LLP,** :
:
         Applicants, :
:
         -against- :
:
**ROTECH HEALTHCARE INC.,** *et al.*, :
:
         Respondents. :
:
-----------------------------------------------------x

**REORGANIZED DEBTORS' OBJECTION TO FIRST AND FINAL
FEE APPLICATION OF BAKER & MCKENZIE LLP FOR
COMPENSATION OF SERVICES RENDERED AND REIMBURSEMENT
OF EXPENSES AS COUNSEL TO THE OFFICIAL COMMITTEE OF
<u>EQUITY SECURITY INTEREST HOLDERS OF ROTECH HEALTHCARE, INC.</u>**

      The above-captioned reorganized debtors ("<u>Rotech</u>" or the "<u>Reorganized Debtors</u>,"

and prior to the Effective Date (as defined below), the "<u>Debtors</u>") submit this objection (the

"<u>Objection</u>") to the *First and Final Fee Application of Baker & McKenzie LLP* ("<u>Baker &

---

[1] The Reorganized Debtors in these chapter 11 cases are listed at
http://dm.epiq11.com/rotech. The address of the corporate headquarters of the Debtors
and the mailing address of each of the Debtors is 2600 Technology Drive, Suite 300,
Orlando, FL 32804.

01:14500447.1

McKenzie") *for Compensation of Services Rendered and Reimbursement of Expenses as Counsel to the Official Committee of Equity Security Interest Holders* (the "Equity Committee") *of Rotech Healthcare, Inc.,* filed on October 25, 2013 [Docket No. 1201] (the "Application"). In support of this Objection, the Reorganized Debtors respectfully represent:

### Summary of Argument[2]

The Court approved Baker & McKenzie's retention application on the express condition its fees would be "[s]ubject to disgorgement if at the end of the day [Baker & McKenzie] did not provide any value to the estate."[3] Subsequently, the Court cautioned that Baker & McKenzie "shouldn't incur substantial costs unless [it] can prove that equity is in the money."[4] Let's look at the record:

1) When Baker & McKenzie was retained, Rotech's proposed chapter 11 plan provided shareholders ten cents a share. The confirmed plan provided shareholders zero.

2) The expenses Baker & McKenzie imposed on the estate include:

   a) To the extent allowed, up to $400,000 plus disbursements billed by Berenson, the Equity Committee's valuation expert, for a valuation that did not prove solvency;

   b) $193,512.70 billed by Grant Thornton, as financial advisor to the Creditors' Committee for a valuation necessitated by the Equity Committee's assertion it was procuring a valuation;

   c) The expenses of attorneys for Rotech (Proskauer Rose), the Creditors' Committee (Otterbourg, Steindler, Houston & Rosen), the second lien noteholders (Wachtell, Lipton, Rosen & Katz), the first lien noteholders (Willkie Farr & Gallagher), and the DIP lender (Fried, Frank, Harris, Shriver & Jacobson) to attend each of the:

   i) Three depositions taken by the Equity Committee that led to nowhere; and

---

[2] Capitalized terms not otherwise defined in the Summary of Argument are defined below.

[3] *In re Rotech Healthcare Inc.*, Case No. 13-10747 (PJW), Transcript of Hearing at 55:1-2 (Bankr. D. Del. June 13, 2013).

[4] *In re Rotech Healthcare Inc.*, Case No. 13-10747 (PJW), Transcript of Hearing at 4:3-6 (Bankr. D. Del. June 18, 2013).

01:14500447.1

2

  ii) Four contested hearings necessitated by the Equity Committee in opposing Rotech's financing motion, Rotech's valuation motion, Rotech's disclosure statement, and Baker & McKenzie's withdrawal motion opposed by its clients.

 d) The expenses of attorneys for Rotech and the second lien noteholders in opposing the Equity Committee's objection to a make-whole claim that was never asserted and whose amount made <u>no</u> difference to shareholders because Rotech was insolvent without counting the make-whole claims as a liability.

3) Baker & McKenzie moved to withdraw as attorneys for the Equity Committee over the Equity Committee's opposition on the eve of the valuation hearing and confirmation hearing.

  Baker & McKenzie's Application is reduced to suggesting its services enabled the Equity Committee to perform its statutory and fiduciary duties to its constituents. Application at ¶ 10. In fact, the Equity Committee's tactics **diminished** value and Baker & McKenzie's Application fails to show how it helped shareholders (its only constituency) in any manner whatsoever.

## Background

  1. On April 8, 2013, each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

  2. On April 18, 2013, the United States Trustee (the "<u>U.S. Trustee</u>") appointed a statutory creditors' committee (the "<u>Creditors' Committee</u>") pursuant to section 1102 of the Bankruptcy Code. On April 24, 2013, the U.S. Trustee appointed the Equity Committee.

  3. On June 14, 2013, the Court authorized Baker & McKenzie's employment and retention as counsel to the Equity Committee.

  4. On June 13, 2013, the Debtors filed the *Debtors' Second Amended Joint Chapter 11 Plan* [Docket No. 512] (the "<u>Plan</u>").

5. On August 14, 2013, Baker & McKenzie filed an emergency motion for leave to withdraw as counsel to the Equity Committee, which was approved on August 19, 2013.

6. On August 29, 2013, this Court entered an order confirming the Plan, which became effective on September 27, 2013 (the "Effective Date").

## Objection

7. **Heavy on Assertions, Weak on Proof – All at the Expense of the Debtors' Estates**. Baker & McKenzie presented several pleadings to this Court, but, with the exception of its own retention application (and that of the Equity Committee's financial advisor, albeit after multiple, wasteful efforts), failed to prevail on any of them. By way of example, the Equity Committee's objection to the Debtors' debtor in possession financing (the "DIP") asserted, among other things, the DIP was an impermissible *sub rosa* plan, and contended Rotech's officers and directors breached their fiduciary duties. Baker & McKenzie did not offer a shred of evidence to this Court in support of its contentions, and the objection was overruled in its entirety. Baker & McKenzie then filed an appeal of the Court's final order approving the DIP.[5] Baker & McKenzie goes on to assert it withdraw its appeal after Rotech withdrew an argument, but that is totally incorrect. It is patently unreasonable for a statutorily appointed committee to object to, and then appeal, the approval of a $30 million DIP financing without which the Debtors could not have survived.[6] Yet,

---

[5] Indeed, the Court noted that in nineteen years on the bench, it did not recall anybody appealing a final DIP order. *In re Rotech Healthcare Inc.*, Case No. 13-10747 (PJW), Transcript of Hearing at 50:9-11 (Bankr. D. Del. June 13, 2013).

[6] As the Court astutely noted in approving the DIP financing, it is difficult to "imagine a better way to kill a Chapter 11 case than by denying the DIP loan." *In re Rotech Healthcare Inc.*, Case No. 13-10747 (PJW), Transcript of Hearing at 121:12-16 (Bankr. D. Del. May 14, 2013).

01:14500447.1

4

Baker & McKenzie expended 293.7 hours on DIP Loan Analysis/Litigation,[7] incurring $158,260.50 in fees (approximately **15% of its total fees**).  It is still a mystery as to what the Equity Committee thought it could accomplish by causing the DIP loan not be approved.

8. The Equity Committee's objections to the Debtors' disclosure statement present another example of Baker & McKenzie's waste of resources of the Court and the parties.  Notably, after key constituencies who had an economic stake in the Plan had agreed on the information to be included in the disclosure statement, the only objection to the disclosure statement came from the Equity Committee – whose constituency *was not entitled to vote* on the plan and was completely unaffected by the disclosure statement.  The shareholder class was deemed to reject the plan.  Nevertheless, the Equity Committee's objection compelled the Debtors to expend significant additional time and resources to respond to the objection.

9. Baker & McKenzie sought to relitigate the same exact issues it had raised with respect to the DIP loan – solvency and breach of fiduciary duty – in its objection to the disclosure statement.  Rotech's disclosure statement (at p. 15, n.7) made clear that Rotech's board of directors had formed a special committee of directors owning no Rotech debt, which special committee negotiated the restructuring.  Nevertheless, like a broken record, the Equity Committee continued to accuse Rotech's board of breaches of fiduciary duties and conflicts of interest on the ground that Rotech had some directors who also owned debt that Rotech was restructuring.  Yet, Baker & McKenzie knowingly continued to pursue the same allegations throughout these cases, creating unnecessary costs not only for itself, but for every other party in interest in these cases.

---

[7] Capitalized terms not otherwise defined shall have the same meaning as ascribed to them in the Application.

01:14500447.1

10. The Equity Committee's objections to the disclosure statement and Plan did not benefit the Debtors' estates or the shareholders because the Equity Committee's constituency was not receiving a distribution under the Plan. The only objection to confirmation raised by the Equity Committee that did not hinge on solvency was to third party releases – again, an issue that did not affect the Equity Committee's constituency because it was deemed to reject the Plan and therefore equity was not providing such releases. For services related to the Plan and disclosure statement that could hardly benefit the Equity Committee, and not even remotely benefit the Debtors' estates, Baker & McKenzie spent 807.5 hours and $399,107.50 in fees – **37% of its total fees**. Only 177.3 hours and $99,312.00 of fees (**not even 10% of total fees**) were expended on the only issue the Equity Committee should have focused on: valuation.[8] Even if Baker & McKenzie had a good faith basis to believe Rotech was solvent, 90% of the fees accrued were in connection with matters other than valuation.

11. **Baker & McKenzie Necessitated Four Hearings on Retention of the Equity Committee's Valuation Expert before it Finally Proceeded Correctly**. Perhaps the most obvious waste of this Court's and other parties' time was Baker & McKenzie's three failed efforts to secure the retention of a valuation expert for the Equity Committee. After the first *two* hearings, the Court denied Moelis' retention application with

---

[8] "Valuation" tasks are described in the Application as "services rendered in connection with valuing the Debtors' estates, and the hearings on the Debtors' Motion for Valuation, and all discovery related thereto and hearings thereon." Application at ¶ 54. While the Application states that the category "Plan and Disclosure Statement" often overlaps with "Valuation Matters," Baker & McKenzie assures that good faith attempts to properly split the time between the two categories were made (Application at ¶ 48). Therefore, Baker & McKenzie cannot now claim any time was mistakenly omitted from the Valuation category and instead billed under other (less relevant) categories.

01:14500447.1

6

its unreasonably high fees (almost two months after the appointment of the Equity Committee), and directed the Equity Committee to hire a valuation expert – apparently in recognition that the only issue the Equity Committee should focus on is valuation. Instead, Baker & McKenzie presented to the Court a retention application for advisory services, which specifically barred the new proposed expert, Berenson, from providing an independent valuation.[9] The Court denied the application on June 28th, and eventually approved Berenson's application on its second try – but not until July 9th, after substantial delay and after all parties incurred additional unnecessary costs due to Baker & McKenzie's failure to use judgment and follow simple instructions.[10] In total, Baker & McKenzie billed $160,712.00 in connection with Retention and Compensation, **which accounts for 15% of the total fees requested.** It is inconceivable that Baker & McKenzie spent more than twice as much time on Retention and Compensation matters (366 hours) as it did on Valuation Matters (177.3 hours).

12. **The Kitchen Sink Approach**. Without explanation, Baker & McKenzie considered it appropriate to bill to Rotech's estate hours spent by its tax associate in Washington DC communicating with politicians about legislation, as follows:

- 06/26/13: Analyze status of Transparency and Accountability in Medicare Bidding Act of 2013; prepare for conference and conference with House Democrats re status of same; analyze status of land background materials re Motion for Temporary Restraining Order in American Association for Homecare vs. Sibelius. **0.9**.

- 06/27/13: Analyze status of Transparency and Accountability in Medicare Bidding Act; prepare correspondence with House Republican staff re status of

---

[9] *See In re Rotech Healthcare Inc.*, Case No. 13-10747 (PJW), Transcript of Hearing at 11:5-7 (Bankr. D. Del. June 28, 2013).

[10] The Application conveniently omits why Berenson's retention application was not approved on June 28th. Application at ¶ 21.

01:14500447.1

7

same; prepare for and attend hearing on Motion for Temporary Restraining Order; prepare summary of salient aspects of hearing and ruling. **6.6**.

13. **Baker & McKenzie's Withdrawal**. For reasons still unknown to the parties in these cases, Baker & McKenzie and the Equity Committee's local counsel filed an emergency motion to withdraw as Equity Committee's counsel on August 14th – five days after Berenson issued a valuation report that did not prove the Debtors' solvency. Over the objection of the Baker & McKenzie's own clients, the Court approved Baker & McKenzie's request on August 16th. Baker & McKenzie's withdrawal, alone, cannot justify the hours and creditors' dollars wasted in all its unnecessary and costly attempts to delay these cases to the point where it was clear, without a doubt, the Equity Committee's constituency would not get a cent in these cases.

14. **Baker & McKenzie's Assertion it was Unaware of the Debtors' Worsening Financial Performance is not Credible.** Baker & McKenzie's asserts that factual developments arising during the Debtors' cases adversely affected the chances of any return to equity.[11] This assertion should not be credited. The Debtors filed their Plan and related disclosure statement in early June 2013. Significantly, the Plan provided that instead of reinstating the Debtors' existing first lien indebtedness, such indebtedness would be refinanced with the proceeds of an exit facility to be provided by the largest second lien noteholders. Further, contemporaneous with the filing of the Plan, advisors for other parties in interest advised the Equity Committee's advisors that the originally filed plan would not be feasible in light of the Debtors' worsening performance. Thus, as early as June 2013 it should have been clear to the Equity Committee and its advisors that the Debtors' results

---

[11] Application at ¶ 29.

01:14500447.1

were again underperforming their projections and the Debtors' assertions of insolvency were true.

15. **Baker & McKenzie Should Not Be Compensated for Services that Did Not Benefit the Shareholders or the Debtors' Estates**. Baker & McKenzie's compensation is subject to Bankruptcy Code sections 330 and 331.[12] Bankruptcy Code section 330 provides that a court may award a professional employed under section 1103 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered . . . and reimbursement for actual, necessary expenses." 11 U.S.C. 330 (a)(1)(A)-(B); *Comm. of Equity Sec. Holders of Federal-Mogul Corp. v. Official Comm. of Unsecured Creditors (In re Fed. Mogul-Global, Inc.)*, 348 F.3d 390, 396 (3d Cir. 2003). Section 330 (a)(3) of the Bankruptcy Code also sets forth the criteria for the award of compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded . . . the court shall consider the nature, the extent and the value of such services, taking into account all relevant factors, including –
>
> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

---

[12] *See* order granting Baker & McKenzie's retention application, dated June 14, 2013 [Docket No. 526].

01:14500447.1

>      (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. 330(a)(3); *In re Fed. Mogul-Global, Inc.*, 348 F.3d at 395.

16.     In addition, section 330(a)(4) provides:

> (4)(A) Except as provided in subparagraph (b), the court shall not allow compensation for—
> (i) unnecessary duplication of services; or
> (ii) services that were not–
>      (I) reasonably likely to benefit the debtor's estate; or
>      (II) necessary to the administration of the case.

11 U.S.C. 330(a)(4).

17.     As opposed to other professionals, Baker & McKenzie deliberately failed to file any monthly fee application during the Debtors' chapter 11 cases, perhaps to avoid immediate scrutiny by this Court, the U.S. Trustee, and other parties in interest, who would have likely objected to the following, among many other things:[13]

   a.   The almost 100 hours spent on drafting the Equity Committee objection to the Debtors' DIP financing (approximately 60 hours) and preparing for the hearing thereon;[14]

   b.   The at least[15] 8 hours spent on preparing the notice of appeal to the DIP order – a five-page document, of which half a page is the notice, and the rest are notice addresses;

---

[13] These are only examples and do not represent all Baker & McKenzie's time entries the Reorganized Debtors find objectionable.

[14] For example, Carmen Lonstein spent 8.5 hours on April 26th to "[a]nalyze and revise draft DIP objection." Application at p. 11 of Exhibit B.

[15] Due to lump entries, it is impossible, in many cases, to understand how much time an attorney spent on a particular task. For example, on May 22nd, Rosa Shirley spent 4.3

    c.    Approximately 65 hours spent on preparing the objection to the Debtors' motion to disband the Equity Committee, including 5.1, 5.5, and 4 hours spent by Carmen Lonstein on May 1st, 2nd, and 3rd, respectively, and additional 35 hours (approximately) spent on preparation for the hearing on the motion to disband;

    d.    The at least 25 hours on the motion for reconsideration of Berenson's retention – a pleading that would have been easily avoided, had Baker & McKenzie simply followed the Court's instructions;

    e.    The duplication of the same time entries for John Mitchell on July 30 (4.8 hours) and July 31 (3.8 hours);

    f.    The raise of hourly rates of Baker & McKenzie's professionals, even though the Baker & McKenzie retention application stated that hourly rates are subject to periodic adjustment *typically at the end of each year*.[16]

18.    Bankruptcy Court section 330(a)(3)(C) instructs that in determining the reasonableness of services, among other things, courts take into account whether services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of a case. Even if Baker & McKenzie believed in good faith throughout these cases the Debtors' enterprise had sufficient value to obtain a distribution for the constituency it represented, the vast majority of services provided *were not* necessary or beneficial – and certainly did not help accelerate the Debtors' chapter 11 cases.

---

hours on: "Begin drafting notice of appeal of DIP Order and update requests for production to the Debtors re Plan." Application at p. 44 of Exhibit C.

[16] *See* Lonstein Declaration, filed on April 30, 2013 [Docket No. 159], at ¶ 23.

01:14500447.1

19.     A responsible Equity Committee and its professionals should have focused their efforts on a single inquiry: are the Debtors solvent? At the hearings regarding the Equity Committee's efforts to retain a financial advisor, the Court repeatedly indicated that valuation should be the primary focus of the Equity Committee and its advisors.[17] Notwithstanding these repeated warnings, Baker & McKenzie engaged in a litany of unrelated endeavors, accruing almost $1,000,000 in fees associated with matters unrelated to valuation compared with approximately $100,000 in fees associated with Valuation Matters. Yet, in light of the significant amount of administrative fees in these cases that were incurred by the Debtors, the Creditors' Committee and the second lien noteholders in responding to Baker & McKenzie's unreasonable attempts to delay an otherwise streamlined and consensual confirmation track, even $100,000 is not fair or reasonable in these circumstances. Accordingly, because Baker & McKenzie's services were not (i) reasonably likely to benefit the Debtors' estates, or (ii) necessary to the administration of the Debtors' cases and because of the significant additional claims Baker & McKenzie caused to be incurred against the Debtors' estates, its fees should be denied in their entirety.

---

[17] For example, the Court repeatedly emphasized that the Equity Committee was to "hir[e] a financial expert to do a valuation," rather than a financial advisor to provide a broad range of services. *In re Rotech Healthcare Inc.*, Case No. 13-10747 (PJW), Transcript of Hearing at 47:18-20 (Bankr. D. Del. June 13, 2013); *see also In re Rotech Healthcare Inc.*, Case No. 13-10747 (PJW), Transcript of Hearing at 12:19-20 (Bankr. D. Del. June 18, 2013); *In re Rotech Healthcare Inc.*, Case No. 13-10747 (PJW), Transcript of Hearing at 10:23-11:2 (Bankr. D. Del. June 28, 2013). Moreover, by ruling that there could be a valuation hearing at or *before* confirmation, the Court further clarified that valuation was the core issue in the case. *See In re Rotech Healthcare Inc.*, Case No. 13-10747 (PJW), Transcript of Hearing at 6:19-20 (Bankr. D. Del. June 18, 2013).

01:14500447.1

**Conclusion**

WHEREFORE the Reorganized Debtors respectfully request the Court deny the Application, and grant Rotech such other and further relief as is just.

| | |
|---|---|
| Dated: November 12, 2013<br>Wilmington, Delaware | YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP<br><br>/s/ Joseph M. Barry<br>James L. Patton, Jr. (No. 2202)<br>Robert S. Brady (No. 2847)<br>Joseph M. Barry (No. 4221)<br>Travis G. Buchanan (No. 5595)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: 302.571.6600<br>Facsimile: 302.571.1253<br><br>-and-<br><br>Martin J. Bienenstock<br>Geoffrey T. Raicht<br>Vincent Indelicato<br>PROSKAUER ROSE LLP<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: 212.969.3000<br>Facsimile: 212.969.2900<br><br>*Co-Attorneys for the Reorganized Debtors* |